U. S. PARKS, Appellant, v. GUY A. THOMPSON, Trustee of the MIS-SOURI PACIFIC RAILROAD COMPANY, a Corporation, Respondent, No. 43032—253 S. W. (2d) 796.

Division Two, December 8, 1952.

Motion for Rehearing or to Transfer to Banc Overruled, January 9, 1953.

792

*Jo B. Gardner* for appellant.

*T. J. Cole, E. A. Barbour, Jr.,* and *Stemmons & Stemmons* for respondent.

BOHLING, C.—U. S. Parks sued Guy A. Thompson, Trustee of the Missouri Pacific Railroad [797] Company, a corporation, for damages in three counts. Count I was under the Federal Employers' Liability Act for injuries sustained in a train wreck and the jury returned a nine-juror verdict for $25,000. In Count II plaintiff asked $42,000 for his alleged wrongful discharge as locomotive fireman by defendant in breach of plaintiff's contract of employment. In Count III plaintiff alleged defendant had breached a duty owed plaintiff in tort in discharging him and asked for $42,000 compensatory damages and $25,000 exemplary damages. Count III was dismissed prior to the trial upon defendant's motion. The court sustained defendant's motion for a directed verdict on Count II at the close of all the evidence; and granted defendant a new trial as to Count I for error in Instruction No. 1 and on the ground the verdict was excessive. Plaintiff appealed.

Plaintiff was employed as a fireman on defendant's Eastern division and was on the extra board out of St. Louis. Defendant's Eastern division extends from St. Louis to Kansas City; but at the time the terminal for freight service out of St. Louis was Jefferson City, and the terminal for passenger service was Sedalia. Plaintiff had made runs on the freight service to Jefferson City. He had never been on

a run west of that point, and was not familiar with the track or the location of the signals west of Jefferson City.

Train orders are issued over the Eastern division; but between St. Louis and Jefferson City there exists "centralized traffic control," that is, trains are operated by signals controlled from a designated point without the necessity of train orders; whereas west of Jefferson City trains are operated entirely under orders to the conductor and engineer by the chief dispatcher at Jefferson City.

Plaintiff was injured when defendant's train No. 2d 9 ran into the rear Pullman of No. 1st 9 a short distance west of Syracuse, Missouri, about 7:40 or 7:48 a.m. January 1, 1948. Engineer Fred C. Butler and plaintiff were called on the crew of No. 2d 9, a passenger train scheduled to leave St. Louis at 11:59 p.m. December 31, 1947. When trains are operated in more than one section, the sections are designated first, second, etc., in the order in which they occupy the tracks. Plaintiff testified he was not advised the run would extend west of Jefferson City.

When 2d 9 arrived at Jefferson City about 2:20 a.m. January 1, 1948, 1st 9 had departed.

The weather from St. Louis to Jefferson City was described by plaintiff as not "so bad," but they encountered some ice, "not too bad," around Jefferson City. At Jefferson City they received orders to wait for a lineman, who was to ride 2d 9 and note the condition of the wires et cetera west of Jefferson City; and 2d 9 pulled out of Jefferson City practically two hours behind 1st 9. As they proceeded west the rain turned into ice and snow, with some sleet, the wind blew the steam and smoke down on plaintiff's side of the locomotive and affected the visibility "very much." Plaintiff had difficulty seeing ahead.

West of Jefferson City 2d 9 met east-bound trains at Scott, at California, and at Clarksburg. At California they received a message reading: "After you meet Number 20 at California and 2d 70, Engine 2209 at Clarksburg, there is no opposing trains in block between Clarksburg and M.K.T. crossing," signed with the initials of the Chief Dispatcher, G. C. Reed, at Jefferson City. The M.K.T. crossing is about 1½ miles east of the station at Sedalia, and 12 miles west of the accident hereinafter mentioned. They were told it was thought that the block signals were out west of California. Plaintiff testified the ice broke the wires, and this threw the signals to a stop, or "red," position, and standby batteries would cause them to show red for 24 hours.

We deem it more appropriate under the issues presented to develop defendant's operating rules in connection with plaintiff's Count II, but mention here that defendant's rules require trains to stop at red signals.

After meeting 2d 70 at Clarksburg, 2d 9 pulled out of the siding and proceeded west. Plaintiff testified that 2d 9 thereafter passed

three red signals and he called them to the [798] engineer, and the engineer said: "That's o.k., the message takes care of that"; that no stop was made; that after they passed Syracuse the track curved and the steam moved to the right, or engineer's side, and about half way down the hill he saw something, 1,000 to 2,000 feet ahead, which looked like the road ended in a snowbank; that there were no torpedoes, fusees, flagman, or lights; that he then saw it was moving and said: "Oh, my God, rear end"; that the speed of 2d 9 had been about 35 miles an hour and perhaps had increased to 40 going down the hill; that the engineer applied the emergency brake, "wasn't nothing to keep us from hitting"; and that he, plaintiff, was climbing over the tank when they hit and his back was caught between the cab of the locomotive and the top of the tender, mashed and injured.

There was other evidence to the effect that the average speed of 2d 9 from Clarksburg to the scene of the accident was 52 miles an hour. The locomotive of 2d 9 went inside the rear Pullman of 1st 9 up to the cab, compressing the Pullman into a space of about eight feet, killing 14 and injuring 34 persons.

On June 21, 1951, plaintiff filed his "First Amended Petition," upon which trial was had. On July 2, 1951, defendant filed a motion "To Strike Out All of Count III of Plaintiff's Amended Petition." This motion was sustained on August 28, 1951. On September 4, 1951, defendant filed his "First Amended Answer to Plaintiff's First Amended Petition." The cause, coming on regularly for trial on October 10, 1951, plaintiff, after the jury had been selected for trial, orally moved to strike out defendant's said "Amended Answer" to Counts I and II, and for judgment on the pleadings, offering to make proof of his damages, on the ground defendant was in default as to said counts, the only counts remaining for trial. The trial court properly overruled the motion.

Plaintiff renews his contention here. His sole authority is RSMo 1949, § 509.260, which provides for the filing of an answer within thirty days after the service of the summons and petition. Our code also provides: "After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings." RSMo 1949, § 509.360. With defendant's answer to plaintiff's amended Counts I and II on file from and after September 4, 1951, plaintiff waived his rights, if any, with respect to defendant being in default by his delay in presenting the issue. The code contemplates trials on the merits that substantial justice be accorded litigants (State ex rel. v. Dinwiddie, 358 Mo. 15, 213 S. W. 2d 127, 129[1]), and plaintiff's contention in the circumstances of record is not in harmony with the spirit of the code. Consult Leis v. Massachusetts Bonding Co., Mo. App., 125 S. W. 2d 906, 908[4]. The record does not establish that plaintiff's First Amended Petition effected any material change in Counts I and II of his original petition. Defend-

798

ant timely filed a motion to dismiss and answer to plaintiff's original petition, and the record does not establish that it was abandoned as to Counts I and II prior to the filing of defendant's amended answer on September 4, 1951. Defendants have been considered not in default in such circumstances. State ex rel. v. Taylor, 200 Mo. App. 333, 206 S. W. 247, 250[4]; Bremen Bank v. Umrath, 55 Mo. App. 43, 50. Consult also RSMo 1949, §§ 509.490, 509.330, and p. 4110, Supreme Court Rule 3.13.

■ Defendant first contends a new trial was properly granted as to Count I on the stated ground the evidence of the doctors was not sufficient to support a finding of permanent injury and the verdict based on medical testimony was excessive and the court had no measure upon which to require a remittitur.

Trial courts in ruling that a verdict is excessive exercise a discretionary function, weigh the evidence, and may infer from the size of the verdict alone misconduct on the part of the jury; that is, that the verdict is so much against the weight of the evidence as to show bias and prejudice. Sofian v. Douglas, 324 Mo. 258, 23 S. W. 2d 126, 129[4]; Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S. W. 2d 157, 159; Mitchell v. Pla-Mor, Inc., 361 Mo. 946, 237 **[799]** S. W. 2d 189, 192; Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S. W. 2d 333, 340.

Our review of the ruling calls for a consideration of the evidence most favorable to the defendant and proceeds on the theory the ruling is correct unless the evidence shows the contrary clearly enough to establish an abuse of discretion on the part of the trial court. Grzeskoviak v. Union El. L. & P. Co., 299 Mo. 116, 252 S. W. 364, 365 [1]; Dietrich v. Cape Brewery & Ice Co., 315 Mo. 507, 286 S. W. 38, 44; Murphy v. Kroger Grocery & B. Co., 350 Mo. 1186, 171 S. W. 2d 610, 612[5]; Mitchell v. Pla-Mor, Inc., 361 Mo. 946, 237 S. W. 2d 189, 192[5]; Nix v. Gulf, M. & O. R. Co., Mo., 240 S. W. 2d 709, 713[5]. Appellate courts do not possess the wide latitude of trial courts when passing upon the excessiveness of a verdict as an original issue on a defendant's appeal. Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 238 S. W. 2d 674, 681[15-17]; Kasten v. St. Louis Pub. Serv. Co., Mo. App., 231 S. W. 2d 252, 257[3-7].

Plaintiff, who was in good health, was injured at about his belt or a little lower. He was knocked out for a few minutes, "was kinda mashed up and bleeding back there," and suffered pain in his back. He received emergency treatment at the Bothwell Memorial hospital at Sedalia, and the next day went to the Missouri Pacific hospital at St. Louis. Plaintiff went to Sedalia on January 6th for the investigation of the wreck, which lasted from Tuesday to Friday. He was released from the hospital at St. Louis on January 13th or 14th. A plaintiff's exhibit gave the final diagnosis at the Missouri Pacific hospital as "Osteoarthritis—multiple—joints" and "Abrasion, moder-

ate, lumbar region, right and left." Plaintiff's lower back, from the belt down, received treatments. Heat was applied. His back was taped. He was given medicine and was told to wear a health belt and sleep on his back on a hard bed. He returned to the hospital every week for a while, then every two weeks, and later about every month for an examination. Exercise aggravated his pain, which started about the third joint in the back and extended down to the right knee, and he was instructed not to exercise, to take it easy. About a year after the accident he had an attack, extremely heavy, could not move his leg for about two days, and was in the Missouri Baptist hospital for about a week. He testified he had pain all the time, the more exercise he takes, the greater the pain, which seems to be worse in the evening.

Dr. F. G. Pernoud, a surgeon of St. Louis, who examined plaintiff on June 14, 1951 and gave his deposition on June 15, 1951, testified that plaintiff received a "ruptured intervertebral disk between the fifth lumbar vertebra and the first sacral vertebra joint," and that "he will have some permanent disability." He stated that "X-rays do not show ruptured disks"; but they show the intervertebral spaces to be irregular, "and I am reasonably certain that is this man's condition"; that some persons having ruptured disks improve, others get worse, but none get well. We do not develop the cross-examination. It did not aid plaintiff.

Plaintiff also took the deposition of Dr. R. D. Woolsey on June 15, 1951. He is a neuro-surgeon of St. Louis, and testified plaintiff was under his care at the Missouri Baptist hospital, where plaintiff remained for three days; that he diagnosed plaintiff's condition as a ruptured intervertebral disk; that a ruptured disk may cause a lot of pain and incapacitate one for a time; that these "bouts" of pain tend to recur and become worse, and about twenty-five percent have an operation to remove the impinging piece of cartilage, and that something can always be done about it at the proper time. He advised plaintiff to go home and rest and was of the opinion if plaintiff did so, he would recover. He never heard anything further from plaintiff.

Dr. H. A. Lowe, a surgeon of Springfield, was defendant's witness. He testified that plaintiff's vertebrae were in good alignment, with no narrowing of the intervertebral spacing; that there was evidence, however, of calcium deposits on the spine, classified as chronic hypertrophic arthritis, which were commensurate with plaintiff's [800] age; that plaintiff's sacroiliac joints were intact; that the only thing he found to cause plaintiff's pain were the hypertrophic changes, and that the pain would be transitory and not a permanent thing.

Plaintiff also testified: "I felt like about six months after the accident that I could go back and perform my duties as a locomotive fireman." Also: "Q. Aside from that week there [in the Baptist hospital] and the six months immediately after you were hurt, you

say you thought you would be able to do your work as a fireman? A. I mean six months after that I· would be able." "Q. Except for that six months after you were hurt, and that week's period when you went to the hospital, do you say you could have done your work all right? A. Yes, sir."

Plaintiff in contending error was committed in dismissing Count II states, among other things, that the recovery for loss of wages after physical rehabilitation must be had on his claim for breach of contract, and that "plaintiff testified that within six months after his injury he would have been able to perform these duties."

Plaintiff wrote C. F.· Dougherty, superintendent of defendant's Eastern division on January 17, 1949, asking permission to go to work in the yard with yard rights.

Considering the evidence upon the question of damages, the conflict in the opinions of plaintiff's physicians, plaintiff's testimony as to his physical condition, that plaintiff's contributory negligence, if any, mitigates the damages, that testimony on plaintiff's Count II was adduced although not submitted to the jury, and all the circumstances of record, we conclude the trial court did not abuse its discretion if it viewed the amount of the verdict to be so excessive as to indicate improper action on the part of the jury, amounting to bias and prejudice, and could not be cured by remittitur. Furthermore, whether a trial court should suggest a remittitur for mere excessiveness of a verdict has been said to rest within its sound discretion. Aut v. St. Louis Pub. Serv. Co., 238 Mo. App. 1136, 194 S. W. 2d 753, 757[5].

 The issues presented with respect to Instruction No. 1 can be, in the main, readily eliminated. Some are not likely to recur. If the record established some of the duties of defendant mentioned in the instruction we have inadvertently overlooked them. For instance: The reference to "torpedoes" (see Rule 99), and the "message" received at California (see Rule 509), and the view being "obstructed." (See Count II, infra, for the rules.) The instruction should be recast.

 Plaintiff was dismissed from service January 14, 1948, for violations of General Rule B, Rules 34, 509, 963, 979 and 980 in connection with the accident. In Count II he claims his dismissal was in breach of Article 50 of his contract of employment which provides that no fireman is to be discharged without just or sufficient cause and without a thorough investigation, at which the fireman may be assisted by a representative of his choice.

Many of defendant's operating rules were offered in evidence. We quote or state the substance of the rules or portions of the rules stressed by the parties and material here.

General Rule B requires employees to be conversant with and to obey the rules and special instructions.

Rule 34 requires all members of engine and train crews to communicate to each other, when practicable, the indication of each signal affecting the movement of their train.

Rule 99 provides that, when a train is moving under circumstances in which it might be overtaken by another, the flagman must protect the train, throwing off lighted fusees at proper intervals. Rule 11 requires trains finding a burning fusee to stop and extinguish it, and then proceed at restricted speed. "Restricted speed" means a speed permitting a stop short of any obstruction, and there was evidence it means a speed not exceeding 15 miles an hour.

Rule 108 reads: "In case of doubt or uncertainty the safe course must be taken."

Rule 509: "When a train or engine is stopped by a Stop-indication, it must stay [801] until authorized to proceed. Upon information from the train dispatcher (or signalman on instructions of train dispatcher) that there is no opposing train in the block, it may, after filling out clearance, when required, proceed at restricted speed, expecting to find a train in the block, broken rail, obstruction or switch not properly set, to the next signal displaying a Proceed indication. * *

"If the means of communication fails, or if the train dispatcher or signalman does not know that there is no opposing train movement involved, the train or engine may proceed when preceded by a flagman to the next signal displaying a Proceed or Proceed at Restricted Speed indication.

"The requirements of this rule must be repeated at each Stop-indication."

Rule 106 makes the engineman and conductor "responsible for the safety of the train and the observance of the rules * *." Rule 881 vests the general direction and government of a train in the conductor, requiring him in case of doubt to consult the engineman and be equally responsible with him for the safety of the train. Rule 518 requires enginemen to approach at restricted speed all signals not plainly visible on account of weather conditions. Rule 955: "* * Firemen while on duty are subordinate to enginemen." Rule 956: "Enginemen are jointly responsible with the conductor for the safety of the train and proper observance of the rules * *." Rule 957 provides for the engineman to take charge of the train when the conductor is not available. Rule 958 requires enginemen to see that their firemen are familiar with their duties and report any disobedience and incompetence.

Rule 963: "Enginemen must, and firemen when practicable will, keep a constant and vigilant lookout; carefully note all signals; see whether other trains are displaying signals, and observe the position of switches; also watch for obstructions and defective track. * *

"Must keep in mind location of all fixed signals in order that the absence of a signal may be noted and action taken in accordance with the rules. * *."

Rule 979: "Firemen and forward trainmen must carefully read train orders, keep them in mind and assist in their observance. They must call attention of conductors or enginemen immediately to any apparent failure to observe train orders, or to clear the time of superior trains, or to comply with rules and instructions.

"In cases where safety of trains and observance of rules or train orders are involved, firemen and forward trainmen are responsible to the extent of their ability to prevent accident or violation of rules."

Rule 980: "When their other duties permit, firemen must keep a careful watch upon the track, instantly warn the engineman of any signals or indication of danger or obstruction, and will keep a sharp lookout for signals displayed by other trains. * * *"

Plaintiff contends that several of the rules, particularly Rule 979, conflict with Article 59 of the contract of employment, providing: "Firemen will not be allowed to run or handle engines at stations or elsewhere on the road, to do switching or other work, unless they are considered competent to do so by their engineers"; and are of no effect. Rule 961 places restrictions upon a fireman operating the engine unless properly authorized so to do; and § 26 (a) of "Special Instructions No. 8" sets forth certain qualifications for an engineer in passenger service, which, we understand, plaintiff did not possess. Plaintiff argues he had no authority, especially under Rules 955, 956, 957, 958, to take charge of the engine, and an attempt by him to stop the train would have subjected him to dismissal for insubordination. The rules appear to be reasonable and merit a reasonable interpretation. The safety of the traveling public calls for their obedience and the prevention of their violation, as well as the safety of the railroad employees and the public generally. A desire among employees to be agreeable furnishes no ground for the violation of rules here involved. Obedience to rules is contemplated, affords cause for commendation, and constitutes no just or sufficient cause for dismissal. Rule 979, as well as other rules here involved, can be complied with by firemen without taking [802] charge of the locomotive. The conflict sought to be developed does not exist.

Plaintiff testified at the trial that he was familiar with the rules; that he read the train orders; that a stop-indication meant a red signal, anything red; and that all the signals he saw after they left Clarksburg were red, which meant that the train should have stopped; that he was not authorized to apply the emergency brake; that he called the signals to the engineer; that "every time I called a block I thought he should have stopped but he said the message took care of it. Q. You didn't tell him, did you? A. No, sir. Q. You thought you

should stop but never once told him to stop, did you? Isn't that right? A. That's right."

At the investigation of the accident on January 6, 1948, at Sedalia, it was agreed in writing that "the facts developed in this investigation may be used as a basis for discipline." Plaintiff was represented at the hearing by J. H. McDonald and H. J. Pirner, General Chairman and Local Chairman of the Locomotive Firemen, respectively, each of whom signed the agreement.

Plaintiff's testimony at the investigation was to the same effect as above, but in greater detail. We need not develop it. Plaintiff knew that it was a violation of the rules to pass a red signal without stopping; that there was no authority in the message to disregard signal indications; and that his train should have stopped at each red indication, regardless of the message. He stated the investigation had been conducted in a fair and impartial manner.

Plaintiff, in his letter of January 17, 1949, to C. F. Dougherty, his former superintendent, also stated: "I know I did make a mistake and a bad one on New Year's day."

The instant case falls within the ruling in Craig v. Thompson, Mo., 244 S. W. 2d 37, 43, and authorities there cited, to the effect that no claim for wrongful discharge arises where a railroad in good faith and in conformity with the employment contract discharges an employee for the clear and admitted violations of rules promulgated for the safety of the traveling public and others after a fair and impartial investigation.

Our discussion of Count II discloses that there was no prejudicial error committed by the trial court in dismissing Count III.

The orders entered by the trial court are affirmed and the cause is remanded for a new trial on Count I of plaintiff's petition. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.