**J. W. DAY, Appellant,**

v.

**UNION PACIFIC RAILROAD COMPANY,**
a Corporation, Respondent.

No. 44010.

Supreme Court of Missouri.

Division No. 1.

March 14, 1955.

Thomas E. Hudson, Robert E. B. Bunch, Hudson & Cavanaugh, Kansas City, for appellant.

James C. Wilson, Lynn E. Rhoads, Kansas City, for respondent Watson, Ess, Marshall & Enggas, Kansas City, of counsel.

LOZIER, Commissioner.

This is an action for personal injuries and property damage allegedly caused by the negligence of defendant-respondent railroad (herein called defendant). Plaintiff-appellant (herein called plaintiff) sued defendant and G. A. Benson, engineer of defendant's train. At the close of plaintiff's evidence, Benson's motion for a directed verdict as to him was sustained. Plaintiff had verdict and judgment for $25,000. Defendant's new trial motion was sustained on the ground that the verdict was "so excessive as to indicate bias, passion and prejudice on the part of the jury." Plaintiff appealed.

Plaintiff now contends that the trial court erred in sustaining defendant's new trial motion because: There was no trial incident suggestive of prejudice on the jury's part; even if excessive, the verdict should have been corrected by remittitur; and, in any event, a new trial should be as to the damages issue only.

Defendant contends that the trial court erred in refusing to sustain its motion for a directed verdict as to it because plaintiff was contributorily negligent as a matter of law; that, even if plaintiff made a submissible case, the trial court properly granted a new trial because the verdict was so excessive as to indicate bias, passion and prejudice on the part of the jury and because of error in two instructions given at plaintiff's request.

At the "North Topeka crossing" in Topeka, Kansas (where defendant customarily maintained a watchman), defendant's two mainline tracks cross Kansas Avenue, a north-south street. According to plaintiff's Exhibit 1, a plat of the area, the tracks cross Kansas Avenue almost at a right angle. The street is 55 feet and 9 inches wide. West of the street and crossing is a 12 foot sidewalk, and on the east a 10 foot sidewalk. It is 20 feet and 9 inches between the north rails of the two tracks. Eleven feet south of the south track and east of the sidewalk is the watchman's "shanty."

North and west of the crossing is a lumber yard, the east side of which is next to the west walk, i. e., 12 feet from the street's west line. The yard's south side, immediately adjacent to the railroad right-of-way, is 12 feet north of the north rail of the north track and 32 feet and 9 inches north of the north rail of the south track. The two tracks are straight between a point about 100 feet east of Kansas Avenue and the station, 400–600 feet to the west.

Quincy Street is east of Kansas Avenue. The only structure between the two streets is a building, the west side of which is about 15 feet east of the east Kansas Avenue sidewalk, and the south side of which is about 25 feet north of defendant's right-of-way. About 20 feet east of the east line of Quincy Street is a mill building. At a point about 100 feet east of Kansas Avenue, a switch track, running east, connects with the north mainline track. East of the switch track connection, the three tracks curve northeasterly, cross Quincy Street and pass around the southeast corner of the mill building—which corner is 512 feet east of the east line of Kansas Avenue.

On April 24, 1947, about 2:15 p. m., plaintiff, driving his tractor-trailer south, started across the crossing and struck defendant's track car, moving eastward on the south (eastbound) track. The tractor-trailer came to a stop with the trailer on the north (westbound) track. The engine of defendant's westbound freight train (Benson was the engineer), struck the trailer's left side and carried the tractor-trailer west about 150 feet.

The evidence is summarized in the light most favorable to plaintiff. Plaintiff testified that: The over-all length of his tractor-trailer was 35 feet; as he drove south on Kansas Avenue, his speed was not over 25 m.p.h.; as he approached the crossing, he reduced his speed; when about 25–30 feet from the crossing, his speed was

not over 10 m.p.h.; his tractor-trailer was about 6-7 feet east of the west sidewalk; at that point, he looked both east and west; he had a clear view for 400–500 feet to the east; the lumber yard obstructed his view to the west; he slowed down for "that rough crossing"; after he "had cleared" the lumber yard, and was in the crossing itself and 10–12 feet north of the north rail of the north track, he again looked to the east and saw the westbound engine east of Quincy Street "or maybe a little past it"; it was "moving very slow," 10–15 m.p.h.; he then looked to the west and saw no movements on either track. (Plaintiff's statement that, after he "had cleared" the lumber yard and was 10–12 feet north of the north track his view was limited to 25–35 feet, is obviously contrary to the physical facts shown by his Exhibit 1 and contrary to his other testimony, viz.: That, at that point, there was nothing to obstruct his view to the west and that he "could see down to the station and on to the west.") He "proceeded across the tracks. I had plenty of time." He reduced his speed to 2–3 m.p.h.

Plaintiff said he never saw the track car itself until after the collision, but did see the man on it, Cottle, before the collision. When he first saw Cottle, the tractor's front wheels were on or just south of the south rail of the north track. Cottle was then "directly in front of me, * * * that was when he shot out right in front of me." Plaintiff had no knowledge of the presence of the track car "before it came out into the intersection"; it was moving and "the collision occurred right after that." Plaintiff said that the track car might have been "standing" or "stopped" west of the sidewalk "waiting to cross" and that he would not have seen it or Cottle because of a "fairly large blind spot" in the corner of his cab. "It would be a blind spot in the cab there that you cannot see anything out of there." Plaintiff couldn't see Cottle because of this blind spot, "if he had been there—I say he could have been there." Plaintiff would have seen Cottle when he (plaintiff) approached the intersection "if he had been at the intersection and stopped. If he came down back of that I would still have had a blind spot * * *."

"Q. In other words, if he was out on the crossing where you finally did see him you could have seen him? A. Yes. * * But if he had been back a half block, I couldn't have seen him. * * *

"Q. So if he stopped short of the crossing and waited before he went across, you would not have seen him, would you? * * A. That is right, if he stopped back there. * * *

"Q. So he may have been there waiting to cross on that crossing and you did not see him because of the blind spot? A. It could be."

Plaintiff said that he was familiar with the crossing, having driven over it 10 times weekly for many years. As he "neared" the crossing that day, there was no watchman in sight; the watchman ran out of his "shanty" after he (plaintiff) saw Cottle "directly in front of me." He had often seen a watchman at the crossing. "Well, always when there was any cross-traffic or trains coming and things like that, why naturally he would be out there as a rule." Plaintiff had seen track cars at the crossing before, "lots of times." Generally, the watchman signaled for them to come on across. He had seen track cars at the crossing many times when the watchman was not present. On such occasions, "ordinarily I have had the track man just wave me through. * * * When the watchman was out there he ordinarily had his sign up and was stopping everything then."

Defendant's evidence favorable to plaintiff was: Cottle testified that he stopped west of the west sidewalk "for about a minute." He then "proceeded to go on east and across the sidewalk and about the time I entered the street, I saw this tractor or trailer approaching from the north. * * Before he started onto the tracks and at a point I expected him to stop, it seems to me as if he speeded up. * * * I cannot be sure on that but it seems to me that he did. * * *" Cottle and the watchman testified that they were familiar with defendant's

rules: "When approaching highway crossings traffic [track] cars must proceed with caution and be prepared to stop if necessary. * * * At highway crossings vehicles have the right of way."

Plaintiff submitted the watchman's negligence in failing to warn him of the approach of the train and track car and Cottle's negligence in moving into the crossing when he saw or should have seen the tractor-trailer "and the danger of collision." In his Instruction No. 1, plaintiff hypothesized defendant's practice and custom of maintaining a watchman at the crossing and plaintiff's knowledge thereof and reliance thereon and told the jury that if it found such to be the facts, it might consider such facts, "together with all of the other facts and circumstances in evidence, in determining whether plaintiff exercised ordinary care in entering into and upon said crossing."

Defendant submitted: Plaintiff's negligence in failing to stop in a position of safety north of the north rail of the north track "even though you find from the evidence that defendant's watchman failed to flag the intersection" and if the watchman "was in the intersection and was flagging traffic," respectively.

Was plaintiff contributorily negligent as a matter of law?

In Horton v. Atchison, T. & S. F. Ry. Co., 161 Kan. 403, 168 P.2d 928, 934 [9], it was said: "It is thus apparent this court has never adopted the rigid and strict rule obtaining in some jurisdictions which requires a traveler to stop under all circumstances before entering upon a railroad track. It is committed to the more liberal rule, and we think justly, which makes it the duty of one about to cross a railroad track to first assure himself he can do so with safety. This rule, however, does require that the diligence of the traveler in so assuring himself must be commensurate with the hazard." And see Woodworth v. Kansas City Public Service Co., Mo., 274 S.W.2d 264. This rule applies to railroad track cars as well as to engines, freight or passenger cars. Johnson v. Missouri, K. & T. Ry. Co., 110 Kan. 378, 204 P. 727, 728 [1]; Atkinson v. Lusk, 103 Kan. 446, 173 P. 914, 915.

The Kansas rule applicable in instances where the railroad has erected gates or maintains watchmen is thus stated in McClain v. Chicago, R. I. & P. Ry. Co., 89 Kan. 24, 130 P. 646, 648 [3]: "A traveler is not required to exercise the same vigilance when he approaches a track as he would at crossings not so guarded. The railroad track itself is a warning of danger which a traveler cannot safely ignore, but when it is the custom of a railroad company to provide gates or flagmen, and thus give other warnings of danger that a train is about to pass, the absence of such warnings may lead a traveler to believe that he can safely proceed, or that there will be time to cross before a train will pass. The fact that gates have been erected and are open when a traveler approaches a crossing will not justify him, of course, in closing his eyes and ears when passing over railroad tracks, but it is a circumstance to be weighed by the jury in determining whether at the time he was using the care that a reasonable and prudent man would and should exercise." And see Blackwell v. Union Pac. R. Co., 331 Mo. 34, 52 S.W.2d 814, 815 [2], and Scott v. Missouri Pac. R. Co., 333 Mo. 374, 62 S.W.2d 834, 836 [3], wherein this court, applying Kansas law, held that whether plaintiff was contributorily negligent (in entering upon a railroad crossing, where the defendant customarily maintained a watchman, when the watchman was not present) was for the jury.

In the Scott case, we said: "If Scott had relied solely on the fact that his view of the approaching train was obstructed, we would hold that he was guilty of contributory negligence as a matter of law. Under such circumstances, it would have been his duty to have stopped his truck and determined whether there was an engine or cars approaching before he drove the truck on or dangerously near the track. * * * But where, as in the case at bar, there are other facts and circumstances in the case calculated to cause an ordinarily prudent person

to conclude that he could cross the track in safety, the question of contributory negligence is one of fact to be determined by the jury. In the instant case, the absence of a flagman at the crossing to warn travelers of the approach of trains, and the fact that no warning of any kind was given, together with other facts and circumstances touching the quantum of care exercised by Scott, tended to show that he was not guilty of contributory negligence, and made that question an issue of fact to be determined by the jury." 62 S.W.2d loc. cit 837 [3].

Defendant asserts that the basic principle of the McClain case was abandoned in Johnson v. Union Pacific R. Co., 157 Kan. 633, 143 P.2d 630; and that the law of Kansas now is that, *in every case,* the failure of a driver to look and see "what is there to be seen before he goes upon a railroad track is contributory negligence as a matter of law despite his reliance upon the presence or absence of a watchman at the crossing."

We do not agree. In our view, Horton v. Atchison, T. & S. F. Ry. Co., supra—decided after the Johnson case—recognized the fundamental principle of the McClain case. And as we read the majority opinion in the Johnson case: Plaintiff's evidence showed no circumstance which would have relieved the deceased driver of his duty to have seen the approaching train; under the circumstances of *that particular case,* the fact of the absence of the customary watchman was not, as a matter of law, sufficient to present a jury question on the driver's contributory negligence. The instant situation is quite different from that in the Johnson case. Here, plaintiff saw the slow-moving approaching train sufficiently far away that he could have crossed the crossing in safety had not Cottle suddenly moved the track car into the crossing and into plaintiff's path after plaintiff had entered the crossing (this latter, of course, under the evidence viewed in the light most favorable to plaintiff).

■ While the question is close, we believe that the issue of instant plaintiff's contributory negligence was properly submitted to the jury. The undisputed evidence was that Cottle had stopped west of the west sidewalk. Plaintiff testified that he had seen track cars at the crossing "many times" when the watchman was not present, that usually the track car operator would stop before entering the crossing and "ordinarily, I have had the track man just wave me through." From such testimony, the jury could have reasonably found that, even though plaintiff may have been negligent in failing to see the track car standing west of the sidewalk, his entry into the crossing under *all* of the circumstances was not negligence. Certainly, we cannot say that he was negligent as a matter of law.

We return to plaintiff's assignment—that the trial court erred in granting a new trial as to all issues on the ground that the verdict was "so excessive as to indicate bias, passion and prejudice on the part of the jury against defendant and in favor of plaintiff." The trial court did not sustain the new trial motion on the ground that the verdict for plaintiff was against the weight of the evidence. And defendant does not now contend that plaintiff did not make a submissible case as to defendant's alleged negligence. Sustention of the new trial motion on the instant specific assigned ground means that the trial court found that, while the jury could have reasonably returned a verdict for plaintiff, the amount of the verdict indicated bias and prejudice against the defendant.

■ In ruling whether a verdict was so excessive as to indicate bias and prejudice of the jury, the trial court, unlike an appellate court, weighs the evidence. Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S.W.2d 333, 340 [15, 16], 8 A.L.R.2d 710; Parks v. Thompson, 363 Mo. 791, 253 S.W. 2d 796, 798 [3–7]; McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W.2d 361, 369 [7–9]. And the trial court, also unlike an appellate court, may infer the jury's bias and prejudice solely from the size of the verdict. Bailey v. Interstate Airmotive and McCaffery v. St. Louis Public Service Co., supra. And remittitur may not be ordered where the verdict resulted from the jury's bias and prejudice. Dye v. St. Louis-San

Francisco Ry. Co., 361 Mo. 331, 234 S.W.2d 532, 534 [3].

■ It follows then that the trial court's order must be sustained unless all of the evidence as to plaintiff's injury and damage, viewed in the light most favorable to sustention of the trial court's ruling, shows that there was no substantial basis for the order. As will appear, the evidence, so viewed, shows a substantial basis for the trial court's finding that the size of the verdict was such as to indicate the jury's bias and prejudice.

Plaintiff argues that he has sustained approximately $10,000 damages for property damage, medical expense and loss of earnings. However, plaintiff, in his damages instruction, did not ask damages for either the damage to his tractor-trailer or for future medical expenses (there was no evidence as to the latter). Plaintiff's medical expense was "$100–$150." So the jury must have allowed at least $24,850 of the $25,000 verdict for the other elements submitted by plaintiff, viz.: "Fair and reasonable compensation for" his "injuries and disabilities," taking "into consideration and account the nature, character and extent of such injuries and disabilities," and bodily pain and suffering he "has suffered" and "is reasonably certain to suffer in the future * * * and any loss of earnings he has sustained or will in the future sustain."

Plaintiff was not rendered unconscious in the collision. He got out of the cab and watched the removal of the tractor-trailer from the tracks. A police car took him to a hospital where X-rays showed no broken bones. He returned to the crossing, got into the tractor-trailer and "had no difficulty" in driving it back to Kansas City, Mo. The next day, an examination by Dr. Ralph S. Casford (plaintiff's witness) showed bruises on plaintiff's back, left hip, right side and pain and muscle spasm in the back. Dr. Casford taped plaintiff's back and gave him sedatives. Plaintiff stayed in bed about a week and then began a series of heat treatments. Dr. Casford said that plaintiff's condition improved, his bruises healed and he had less pain especially when quiet, but movement "stirred up the pain in his back." At trial time, plaintiff still had a "spastic condition" in the muscles of his spine. This, in the doctor's opinion, was due to an arthritic spine or, possibly, a disc injury and "could have been" the result of trauma sustained in the collision.

Dr. Frank L. Feierabend (plaintiff's witness) examined plaintiff about 3 weeks after the collision. The doctor found a "slight limitation indicating some trouble in the lower back, * * * some instability in the region of the facets, * * * a congenital failure of fusion in the third lumbar vertebra, * * * a marked lipping and spur formation on the anterior surface of the fifth lumbar vertebra and * * * a marked thinning of the disc between the last lumbar and the first sacral segment. * * * There was no evidence of fracture and no compression of any of the bodies of the vertebrae and no dislocations. * * * I thought at the time that he had an aggravation of pre-existing conditions in his lower back but I do not think an accurate conclusion can be made. * * * At that time he had findings which would make one suspicious of this, but insufficient clinical findings."

Dr. Feierabend examined plaintiff again in May 1952. "I found tenderness in the lumbro-sacral area and over both sciatic areas * * * considerable loss in the normal lumbar curve. * * * Muscle spasm in the lumbar area on both sides. * * * There was no atrophy of the thighs or calves." At trial time, the doctor believed that plaintiff had "a protruded intervertebral disc and will require surgery before he gets well." Such surgery would leave plaintiff with a temporary disability for about three months and thereafter a permanent disability of about 15 per cent, "considering the body as a whole." In the doctor's opinion, plaintiff's disability "could have been" the result of the collision.

Dr. C. G. Leitch (defendant's witness) examined plaintiff on May 31, 1949. On that day, plaintiff told him that "he had pain in his lower back and that he had no other complaints." The results of the general physical examination were negative. There

were no abnormalities in the muscles of the extremities and the reflexes in the extremities were normal. "There was no deformity or external abnormality noted about the spine * * * and no external evidence of injury to his spine. * * * As of the time of my examination, I found no evidence of disability existing in Mr. Day attributable to injury." Plaintiff "did not have a ruptured disc as of the time I examined him." In the doctor's opinion, plaintiff had degenerative hypertrophic osteoarthritis of the higher spine.

Plaintiff's own testimony as to the nature and extent of the injuries he claimed to have sustained in the collision, was: After the collision, "I did not do anything but drive, no lifting at all. * * * Both legs are bothering me. * * * They have a numb sensation. Well, just a pain that starts in there and I have to have relief by raising up in my seat and getting out of the truck entirely and walking around; * * * that has developed in the last three or four years." Plaintiff's back "still hurts, * * has never stopped hurting * * * and is hurting me now. * * * Lifting or carrying objects or any quick move will hurt. * * * Driving (a tractor-trailer) hurts. * * * I have to sit on foam rubber cushions and have a foam rubber cushion back of me."

Plaintiff was 49 years old at trial time. He had regularly driven his tractor-trailer for a paper company for 15–20 years. He hauled baled paper from Topeka, Kansas, to Kansas City, Missouri, on an average of five days a week. He assisted in loading and unloading the 1000–1200 pound bales. He had had no disabilities which prevented him from doing heavy work. Plaintiff said that his weekly earnings prior to the collision averaged $100 a week. However, he offered no evidence corroboratory of that statement. (The superintendent of the paper company, plaintiff's witness as to other matters, was not asked as to plaintiff's earnings.)

His tractor-trailer was "repossessed" by the finance company on October 1, 1947, a little over five months after the collision. Before he lost his tractor-trailer, he worked for Riss & Company. There was more work he could do if he had a truck, "you can make a decent living with a truck." Thereafter, "my condition kept me from making a decent living because I just couldn't do any kind of work that I might pick up anywhere. * * * I had to pick my jobs. * * *" He worked for Mid-West Freight Lines for a month in January–February 1948, and after that "just worked odd places, all around; I don't remember all of them; any place I could get a few days work." He worked for Watson & Company, "put in a few days at Terminal Warehouse" and then for Auto Transport (for which company he was still working at trial time, May 1953). Otherwise, plaintiff did not testify nor offer any other evidence as to when, for whom or at what wages he worked after the collision.

While the evidence, considered in the light most favorable to plaintiff, would have supported opposite findings, there was substantial evidence from which the trial court could have reasonably found that plaintiff's spinal condition at trial time was neither the result of injuries sustained in the collision nor as serious as he claimed. Again noting the complete absence of any evidence upon which to base an award for loss of earnings, we hold that the trial court did not abuse its discretion when, after weighing all of the evidence, it found that the $25,000 verdict was so excessive as to indicate bias and prejudice on the part of the jury.

Our hereinbefore rulings render unnecessary determination of defendant's challenges to plaintiff's Instructions 1 and 2. In any new trial, plaintiff will, no doubt, consider those challenges in drafting his instructions.

The order granting defendant a new trial is affirmed.

VAN OSDOL and COIL, CC., concurs.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur.