W. R. LEE, Respondent,

v.

**MISSOURI PACIFIC RAILROAD COM-PANY, a Corporation, Appellant.**

No. 47417.

Supreme Court of Missouri,

Division No. 1.

April 11, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied May 9, 1960.

Harold L. Harvey, St. Louis, Farrington & Curtis, Jack S. Curtis, Springfield, for appellant.

Sam R. Gardner, Monett, for respondent.

HYDE, Presiding Judge.

Action for damages for wrongful discharge. At the close of all the evidence, the court directed a verdict for plaintiff on liability and the jury assessed damages at $14,796.71. Defendant has appealed from the judgment entered thereon and claims error in directing the verdict for plaintiff and in refusing to direct a verdict for it.

Plaintiff was the engineer on a freight train operating between Springfield and Crane. The incident resulting in plaintiff's discharge occurred during switching operations in the yards at Crane. On arriving in the Crane yards, the train went on a sidetrack, the caboose was uncoupled and placed on the main line track just clear of the switch from the main line to the sidetrack. When the engine went back on the sidetrack, plaintiff told the brakeman, Mr. Gray, to line the switch for the main line and lock it. The brakeman told plaintiff that the conductor, Mr. Mullen, had instructed him to leave the switch open for the sidetrack and he refused to line it as plaintiff directed. (Switching operations could be carried on easier and faster if the switch was left open.) Plaintiff then told the fireman to close and lock the switch and he did so. Conductor Mullen had gone to the yard office (about 500 feet away) for switching directions and plaintiff moved the train there. (Plaintiff and Mullen, each with more than 50 years' service, apparently did not get along well.) When Mullen learned the switch had been closed, he had the station agent, Mr. Jones, call Nevada to report that plaintiff refused to follow his order and leave the switch open. The Division Superintendent there, Mr. Shaver, after talking to Mullen and Jones instructed Jones to give plaintiff a notice relieving him from duty; and an investigation of plaintiff's conduct was thereafter held as required by the contract between defendant and plaintiff's union, after which plaintiff was discharged.

At the trial, plaintiff offered in evidence defendant's "Uniform Code of Operating Rules" but the controversy was mainly about the interpretation of Rule 104(1); pertinent parts of Rule 104 were as follows:

"Rule 104. Hand Operated Switches.—

"(1) Main track switches must be lined and locked for main track when not in use. * * *

"(2) Except as prescribed by Rule 402, main track switches must not be left open after movement through them is completed, unless attended by a member of the crew.

"(3) A main track switch must not be left open for a following train or engine, unless in charge of a member of the crew of such train or engine, or an assigned switchtender.

"(4) When practicable, the engineer must see that switches near the engine are properly lined and must require other members of crew on engine to observe position of such switches. * * *"

(Rule 402 did not apply to the movement herein involved.)

Plaintiff also relied on Rules 107 and 108, as follows:

"Rule 107. Co-operation Between Crew Members.—Conductors and engineers must bring about co-operation between all members of the crew.

"(1) Both the conductor and the engineer are responsible for the safety of the train and the observance of the rules, and, under conditions not provided for by the rules must take every precaution for protection.

"(2) The general direction and government of a train is vested in the conductor, and all persons employed on the train must obey his instructions. Should there be any doubt as to author-

ity or safety of proceeding from any cause, the conductor must consult the engineer and be equally responsible with him for the safety and proper handling of the train.

"Conductors and engineers are responsible for the protection of their train. Conductors are responsible for the position of switches used by them and their trainmen.

"(3) Engineers are jointly responsible with the conductor for the safety of the train, and proper observance of the rules, and although they are under the direction of the conductor regarding the supervision of trains, they will not comply with any instructions which imperil the safety of the train or involve a violation of the rules. * * *

"(5) When the conductor is not present, trainmen must promptly obey the instructions of the engineer relating to the safety and protection of the train."

"Rule 108. In case of doubt or uncertainty, the safe course must be taken."

Other rules referred to and relied on by defendant were Rule 501 requiring employes to "comply with instructions from the superintendent and such others as may have the proper jurisdiction"; and Rule N providing that employes who are insubordinate will not be retained in the service.

In 1954, plaintiff had been investigated along with his crew for leaving this switch open at Crane, in violation of Rule 104, and plaintiff got 20 demerit marks (30 was enough for discharge). The conductor who was with him at that time, Mr. Vineyard, got 10 demerits; and he said it had been the practice for 40 years to leave the switch open but the higher officers then said "that unless you left a member of the crew at the switch that the switch would have to be lined up for the main track as soon as the cars cleared the main track at all times." Vineyard also said they were

later told they could leave the switch open if there was a car on the main track and that then he worked that way. (They did not have a car on the main line at the time of the 1954 charges.) Defendant's witness, brakeman Gray, said there was "much trouble regarding 104"; that "one time one would tell you one thing and one would tell you another"; but that recently (within a year or two) "they told me they decided it would be O.K. * * * that is with a car on the main line." Conductor Mullen also said officials have changed their minds from time to time on the meaning of Rule 104 and "have told us different on it"; but that "the superintendent and the trainmaster changed the interpretation of the rule and said we were not violating any rule by leaving it open and leaving a car on the main line."

Plaintiff took the position that leaving a car on the main track did not make a use of the switch; that it was not in use "unless a train is astraddle of that switch"; and that when all cars cleared the switch it was not in use and it was then necessary either to close the switch or to station a brakeman to attend it. Rule B emphasized by plaintiff stated: "Employes must have a proper understanding and working knowledge of and obey all rules and instructions in whatever form issued, applicable to or affecting their duties. If in doubt as to their meaning, employes must apply to the proper officer for an explanation. When properly authorized, rules may be cancelled, superseded or changed by: (1) General order, (2) Special instructions in the timetable or in pamphlet form, (3) Paster in the book of rules." Plaintiff also relied on the following notation in the timetable furnished him: "Note Well and Remember: 1. No officer or employe has the authority to violate a rule. 2. No officer or employe has the authority to tell anyone to violate a rule." Plaintiff's position was that he was being told to violate Rule 104; that the timetable notation and Rule 107 required him not to do so; and that Rule 104 would have to be changed to make leaving a car

on the main track a reason for leaving the switch open.

It appears that plaintiff had expressed his strong personal views about Rule 104, which had grown out of the previous disciplinary action against him, and these views were known to the conductor and others. It was shown both at defendant's investigation of the charges against plaintiff and at the trial that during the week before the incident resulting in his discharge, plaintiff had been told by the trainmaster, Mr. Ragland, that he was violating no rule in leaving the switch open when he had a car on the track, while completing the switching movements, but plaintiff refused to work that way. (Plaintiff did say he worked that way at Hurley, a station between the terminals; and that the only places he insisted on closing the switch were Crane and Springfield because the chance of being caught at these terminals was greater.) Superintendent Shaver testified that, after plaintiff was relieved and a hearing had been held as required by the union contract, he and Ragland talked to plaintiff at Crane and offered to reinstate him if he would agree to comply with his switching instructions. He said: "The interpretation I gave Lee with reference to this rule, which has been the same in my experience since 1928, is that if a car or cut of cars are left on the main track in the immediate vicinity of the switch that that would be considered as the switch being in use and they would not have to leave a man there in attendance and would not have to line and lock it every time a movement was made through it." Shaver also said that was the General Manager's interpretation of Rule 104. However, plaintiff told him "that he would not comply with my instructions unless I would issue a general order saying it was not necessary to comply with Rule 104." Shaver further stated: "I pleaded with Lee to heed my instructions and he told me he would not, and he finally told me that if that was all I had to offer he would be on his way, and he left." Plaintiff confirmed part of this conversation with Shaver, saying: "He did say the general manager said you could use that switch and leave it open, and I said, 'the only way to change that rule is by general order or special instructions by bulletin order or sticker in the book of rules.' Q. And unless they did that you would not work any other way than you had been even though the general manager said you could or said to do it? A. That's right. * * * Q. The general manager's interpretation of it was that you could leave the switch open as long as you had a car on there? A. Yes." Defendant's evidence also showed that, at the time plaintiff closed the switch, no passenger train was due for more than an hour and a half and that all other trains coming into the yards were required to operate at restricted speed so as to be able to stop short of the caboose on the main line track. Plaintiff says the conversation with Shaver cannot be considered because it was after the investigation; but our view is that it was relevant and material on the issue of wrongful discharge to show that before discharge plaintiff was offered reinstatement if he would follow the instructions of his superior officers concerning their interpretation of Rule 104.

Article 44 of the contract between plaintiff's union and defendant provided:

"Discipline Appeal and Representation.

"(a) No engineer shall be discharged, suspended or have notation placed against his record without just or sufficient cause. When an engineer is charged with an offense which would warrant his suspension or discharge, if sustained, no suspension or discharge shall be inflicted (except suspension pending investigation) without a thorough investigation within five (5) days before the official having jurisdiction, at which he may have an engineer of his choice assist him in the investigation, who will be permitted to examine witnesses. He or his representative shall be furnished with a copy

of the evidence brought out at such investigation, which will be the basis for discipline administered. When an engineer is called for investigation he shall be notified in advance for what purpose he is called.

"(b) If the engineer is not satisfied with the result of the investigation, he shall have the right to appeal his case through the General Chairman to the General Superintendent and then, if necessary, to the General Manager. * * *

"(c) Any complaint or evidence against an engineer which may affect his rights or employment shall be in writing."

The notice of hearing given to plaintiff stated: "Formal investigation will be held at Crane Mo 2 PM Friday June 7 1957 to develop the facts and place responsibility in connection with Engr W R Lee refusing to comply with instructions of Condr J D Mullen in the switching being performed by their crew on No 760 at Crane Mo about 10 AM June 4 1957  Arrange to be present with witnesses and representative of your choice if desired." Plaintiff's notice of dismissal made the same statement as to the incident involved.

Plaintiff states the following reasons for claiming the court properly directed a verdict for him: (1) that defendant is liable for breach of contract because the manner of discharging him was improper under the contract; (2) he received no orders from Mullen so could not be guilty of refusing to comply with his orders; (3) his discharge was based on matters other than evidence at the investigation. Plaintiff says he was entitled to a directed verdict even if there was a justifiable reason for discharge. Plaintiff apparently considers that he was discharged for violating Rules 107 (requiring instructions of the conductor to be obeyed) and 501 (requiring compliance with instructions of the superintendent and others having proper jurisdiction) and says that he was not charged with violation of

these rules or notified that he would be investigated on them and in fact was not investigated on them. Plaintiff says: "[D]efendant breached the contract as a matter of law by: 1—failure to notify plaintiff of all charges, and, 2—failure to investigate plaintiff on all charges, and, 3—failure to base discharge on the investigation." Because of these contentions we must consider the transcript of the investigation received in evidence at the trial.

Plaintiff relies mainly on Lyons v. St. Joseph Belt Ry. Co., 232 Mo.App. 575, 84 S.W.2d 933, but cites also as holding "that even though there is a justifiable reason for discharging plaintiff the discharge must be done in conformity with the contract," Parks v. Thompson, 363 Mo. 791, 253 S.W. 2d 796; Johnson v. Thompson, Mo.Sup., 251 S.W.2d 645; Craig v. Thompson, Mo. Sup., 244 S.W.2d 37. However, in the Lyons case, the plaintiff was discharged without being given any hearing and without any charges being made against him, although there was a union contract similar to the one in this case. In fact the defendant's officers refused to give the plaintiff any reason except to say that his services were unsatisfactory. The substantial damages therein were for refusal to give a service letter (see Section 290.140 RSMo 1949, V.A.M.S.) with only one dollar damages for wrongful discharge. Apparently the real reason for discharge in the Lyons case was activity as a union officer, claimed to have been during working hours, since it was admitted that the plaintiff was a competent engineer and did render efficient services as such. It was not contended in the Lyons case that the plaintiff was entitled to a directed verdict and the court said: "Whether plaintiff had neglected his service or been guilty of a violation of defendant's rules or of any wrongful conduct in his employment was, under the evidence, a question for the jury." [232 Mo.App. 575, 84 N.W.2d 942.] Neither of the other cases cited involved the question of a plaintiff's right to a directed verdict because of failure of his employer to comply with the terms of a union contract concerning charges and

hearings thereon. Plaintiff overlooks the fact that this is a suit for wrongful discharge and not an action to enforce provisions of a union contract for a hearing. For such a case see Coyle v. Erie R. Co., 1 N.J. 350, 63 A.2d 702.

▮ Furthermore, we cannot agree with plaintiff's contention that the notice was insufficient to comply with the contract, which only required an engineer to be notified "for what purpose he is called." It did specify the time and place of the occurrence to be investigated and that the responsibility of plaintiff in refusing to comply with the conductor's instructions was the matter involved. We hold that such a statement of facts was sufficient to show defendant "for what purpose he is called"; and that it was not necessary to specify all applicable rules in the notice. Even in a petition in a lawsuit, our code only requires "a short plain statement of the facts." (See Section 509.050 RSMo 1949, V.A.M.S.) During the investigation Rule N and Rule 107 were read into the record without objection and plaintiff himself voluntarily brought in Rule 104 and Rule B in his testimony there as justification for his conduct. (Plaintiff offered all of defendant's rules at the trial.) Likewise, we do not agree that the fact the conductor's order was not given to plaintiff in person shows that he had no responsibility, under the circumstances shown, in refusing to comply with his instructions concerning the position of the switch. Both at the investigation and at the trial, plaintiff admitted he knew what the conductor's instructions were, because the brakeman told him what they were, before plaintiff required the fireman to do what the conductor had told the brakeman not to do. Conductor Mullen testified at the investigation that he told both brakemen to put the caboose up the main track and leave the switch open and said if plaintiff "asked them to line the switch back to the main track I told them not to do it." Asked why he gave such instructions he said that plaintiff "has done it before and has

lined the switch behind us before when we had to go right back in two or three minutes." At the investigation, Mullen also said he had reported that incident to trainmaster Ragland who had thereafter "instructed me and Mr. Lee that we were violating no rule when the main line was occupied and we was switching in the Crane yard." Although, at the investigation, it was objected that the trainmaster's instructions had nothing to do with the matter investigated, our view is that it was relevant and material on the issue of plaintiff's responsibility, on this occasion, to show that plaintiff knew of his superior officers' interpretation of Rule 104. Plaintiff's contentions would make such contract investigations conducted by laymen more restricted and technical than court trials.

▮ We agree with the statement in Coyle v. Erie R. Co., supra, 63 A.2d loc. cit. 704, that such a provision in a union contract "does not provide for a hearing in the technical sense of a court proceeding." Likewise, as stated by the U. S. Court of Appeals, 5th Circuit, in Moore v. Missouri Pacific R. Co., 264 F. 2d 754, 755, it is a "mistaken idea that the suits, instead of being common law suits for wrongful discharge, constituted in effect appeals to the district court from the findings and actions of an administrative board." In the Coyle case, there had been no real hearing and the court (63 A. 2d loc. cit. 704) ordered the discharged employes reinstated pending investigation in compliance with the contract. In the Moore case, it was held (264 F.2d loc. cit. 756, 757) the real issue was whether the discharges were wrongful, instead of as the district court instructed whether the discharges were not made in good faith; it appearing at the time of the trial in that case that the men discharged "in fact were not guilty" of the charges on which they were investigated. In this case, not only did plaintiff have a full and fair hearing but also, after the investigation, he was offered reinstatement if he would work in accordance with the interpretation of

defendant's officials as to the application of Rule 104; and furthermore the testimony at the investigation showed plaintiff was in fact guilty of refusing to comply with the instructions of the conductor. We, therefore, hold plaintiff was not entitled to a directed verdict on the ground that, as a matter of law, the evidence showed a breach of the union contract because of the notice given, the investigation held or failure to base the discharge on the facts brought out at the investigation.

■ Was defendant entitled to a directed verdict? As all the above-cited authorities show, the decisive issue in a wrongful discharge case is whether or not the discharge involved was wrongful. The essence of the union contract was that an engineer would not be discharged "without just or sufficient cause." Our conclusion about this case is that it is a case like Craig v. Thompson, supra, in which we held (244 S.W.2d loc. cit. 43) there was "no evidence from which a jury could infer and find that plaintiff's discharge from the service of the railroad was wrongful" because "viewed most favorably to him, plaintiff's own testimony shows" rule violations which constituted just and sufficient cause for his discharge. It is apparent from plaintiff's own testimony that he took the position that his interpretation of Rule 104 as to what constituted the use of a main line switch was the only one possible and that he refused to work at Crane under any other. However, this rule was not so definite and certain as to what would constitute the use of a main line switch as to make plaintiff's narrow strict interpretation the only possible one. Therefore, it was necessary that it be interpreted and Rule B (a rule upon which plaintiff relies) gave defendant's managing officers, who were plaintiff's superiors, the authority to make interpretation of rules for employes, saying: "If in doubt as to their meaning, employes must apply to the proper officer for an explanation." Since

there had apparently been some confusion about the proper interpretation of Rule 104, at least on plaintiff's line, plaintiff's superior officers had not only the authority but the duty to interpret it. Plaintiff had been informed of their interpretation, which cannot be held unreasonable, before the occurrence herein involved; but even though he knew of it and knew that the conductor had been so instructed concerning it, he deliberately ordered action exactly contrary to the instructions he knew had been given by the conductor on that occasion. Plaintiff had no right to make himself the sole judge of the proper interpretation of Rule 104. We must hold that plaintiff's action was in violation of Rule 104 as interpreted by his superior officers; that he violated Rule 107 in refusing to obey the conductor's instructions and violated Rule 501 by refusal to comply with the instructions of the trainmaster concerning the authorized interpretation of Rule 104; that his conduct was insubordination stated as ground for discharge in Rule N; and that all these violations appear from facts shown at the investigation. For insubordination cases involving discharge see Pelot v. Schott, D.C., 70 F.Supp. 981; Daniels v. Barfield, D.C., 77 F.Supp. 283; see also 56 C.J.S. Master and Servant § 54b, pp. 461–462. Plaintiff's unreasonableness and insubordination is emphasized by his admission that he would work with the switch open at stations between terminals but not at the terminals where officials might see him do so. A railroad could not be operated without final authority in its officers to make rules, reasonably interpret them and require obedience to them as reasonably interpreted. We hold that plaintiff's evidence conclusively shows that he was not wrongfully discharged; and that the court should have directed a verdict for defendant.

The judgment is reversed.

All concur.