HERSCHEL FAIRE, (Plaintiff) Appellant, v. ROBERT BURKE, RICHARD BURKE, EMMETT T. BURKE, JOHN BURKE, and HARRY GILTZ, d/b/a Burke Bros. & Giltz, (Defendants) Respondents, No. 42933—252 S. W. (2d) 289.

Division One, November 10, 1952.

*W. Clifton Banta* for appellant.

*T. J. Brown, Jr.,* and *Marshall Craig* for respondents.

LOZIER, C.—Plaintiff-appellant (herein called plaintiff) sued defendants-respondent (herein called defendants) for $9750 for alleged damage to plaintiff's 1949 cotton crop resulting from

defendants' spraying their corn crop. Trial was by the court without a jury. Finding and judgment were for defendants. Plaintiff appealed.

The issue is the sufficiency of the evidence to sustain the judgment. ▌ Under RSMo 1949, Sec. 510.310, V.A.M.S.: "We review this non-jury case as a suit in equity; we give due regard to the trial court's opportunity to judge the credibility of the witnesses; the judgment may not be set aside unless clearly erroneous." Kimberly v. Presley, (Mo.) 245 S. W. 2d 72, 75. "The question for our determination is therefore not merely one of whether the court's finding was supported by substantial evidence. On the contrary, it is our duty to make our own independent finding of the facts and reach our own conclusion as to where the weight of the evidence lies. Whatever findings the lower court may have made are in no sense binding upon us, although in matters where the evidence is conflicting and close we shall have due regard for the lower court's opportunity to judge the credibility of the witnesses." Redden v. Boehmer, (Mo. App.) 223 S. W. 2d 127, 129.

▌ The case was pleaded and tried below, and submitted here, upon the theory that defendants sprayed the weeds in their cornfield at a time when a strong wind carried the weed killer to plaintiff's field and caused damage to his cotton crop. Our appellate courts have not heretofore had occasion to consider a landowner's liability for damage to an adjoining landowner's crops from chemical sprays. Without becoming involved in the current controversy in the chemical-agricultural world as to the beneficial or. pernicious effects of chemical sprays upon soil or crops, we approve the rule stated in Anno. 12 A.L.R. 2d 436, 438: "There can be no doubt that farmers * * * have the right to use the many beneficial new dusts and sprays * * * and to assure the best possible product by dusts and sprays which eliminate weeds which would otherwise choke out or stunt growth. But such preventive measures cannot be used with absolute impunity. Due care must be exercised in seeing to it that the weather conditions are right, * * * and that they [the spreaders] do not spread dust when the wind is so blowing as to float it to the crops of others * * * . In other words, an owner of premises may be liable to damages for spreading poisonous dusts and sprays negligently."

The geographical situation is shown by the accompanying plat. (This is the trial "Court's Exhibit 1," showing the path of the spray—between the parallel wind direction lines—as found by the trial court. We have superimposed the spray's path as shown by plaintiff's Exhibit 1.)

▌ ▌ Plaintiff Faire, defendants and some of the witnesses owned or operated farms abutting the north-south county road. Of

plaintiff's land in the SE¼, Sec. 28, south of the ditch was in clover, the west part north of the ditch was in corn and the east part north of the ditch (approximately 60 acres) was in cotton. So far as material here, all of the other lands abutting the road were in cotton except defendants' (in the W½ SW¼, Sec. 22) which was in corn. As to type of soil, "high and low spots," "wetness" and drainage, plaintiff's land was similar to that of his neighbors. The year 1949 was an "extremely wet year." Around July 6, there was an unusually heavy rain.

It was conceded that defendants sprayed the weeds in their 80 acre cornfield with a 2,4-D solution, for two days, late in June. According to R. Q. Brown, county agent, the "symptoms" of 2,4-D poisoning in cotton are: escalloped and narrowed leaves, split blooms and flared squares, and later, elongated and misshapen bolls. In "very serious cases," the stalks become stunted with "swellings" near the base.

In finding for defendants, the trial judge said: "The testimony also indicates that the wind on the day in question was from the northeast, and on the map I have a compass and have outlined * * * the general direction that the poison took, in view of the testimony as to the direction the wind was blowing. * * *" We concur that the testimony was that the wind was *from the northeast* but we do not agree with the finding that the wind was from "compass northeast." Scott said the wind was "from a northeast direction" and "from the northeast." And Simmons said "it was out of the northeast" and "blowing out of the northeast towards the (his) house." We do not believe that these two witnesses meant that the wind direction was at an angle exactly 45 degrees east of compass north. Furthermore, the testimony of the adjoining landowners as to the spray's path across their respective crops supports this conclusion. On the west side of the road, only a few acres in the northeast corner of Cole's crop were affected. The east part of Jones' crop was affected — "the way the field ran, it (the spray) went kind of angling across the east end of it. The west end wasn't affected much." All of Frank Crawford's and Simmons' crops were affected. The effect of the testimony of defendants' witness Bebout was that much more of plaintiff's crop showed the "symptoms" than the small acreage indicated by the trial "Court's Exhibit 1." While the evidence as to the spray's effect upon Scott's crop, east of the road, tends to support the trial court's theory, the weight of the evidence is (and we so find) that the wind direction was farther to the south and east, and that more of plaintiff's cotton acreage was in the spray's path, than that found by the trial court.

Plaintiff testified that a few days after the July rain, he noticed that the leaves of his cotton had wilted and that thereafter the new

leaves grew "long and knobby, and curled up at the edges; * * * about all the blooms and squares fell off; the bolls were small and with a sharp point; all of the cotton was affected that way." Plaintiff consulted County Agent Brown who told him it looked like 2,4-D poisoning but that "it was mighty hard at that stage to tell what the final result might be and that there wasn't much use giving the matter much consideration then and that he'd better wait a while"; plaintiff noticed that Scott's, Jones', Frank Crawford's and Simmons' cotton was similarly affected.

Scott, Cole, Jones, Frank Crawford and Simmons described the spray's effect upon their own cotton, both as to the "symptoms" and the particular areas of their fields affected. Scott, Jones and Frank Crawford said that, as observed from the road, plaintiff's crop showed the same "symptoms" as their own crops. So did Simmons who had gone into plaintiff's field. Holmes (whose farm was not in that neighborhood) had observed plaintiff's crop from the road after the July rain and to him "it looked like poisoned cotton."

Defendant Dick Burke, called by plaintiff, said that ten days or two weeks after the spraying, plaintiff talked to him, "saying his cotton was damaged, and I told him the only way he could prove his cotton was [293] damaged was to cultivate it in the normal manner and see what it would make, and if there was any damage from our spray we would pay it, which he did not do. * * * I looked at his cotton at the time and could not see any damage. * * * I looked at Lyle Scott's cotton from the road and you could see some sign of maybe poison on top of the leaves. * * * I looked at Simmons' cotton from the road and it was the same thing, but very little damage, or very little effect."

At defendant's request, County Agent Brown went to plaintiff's field in November or December, 1949. He found no evidence of damage by poisoning, but "could not say" positively "that there wasn't some 2,4-D damage to that crop." In his opinion, such damage would have had to have been serious to leave any evidence "at that late date; * * * the cotton at the time I saw it had been pretty well picked out. * * * There were just the stalks left."

Brown was in Scott's field in October and found evidence of serious damage. The indications of serious damage in Scott's field were misshapen bolls and abnormally formed leaves, stalks with the joints crowded together and the swelled stems around the base of the plant in some cases. Brown examined the Jones cotton and found "considerable, not very serious," damage there. He was also in Simmons' field in October and found no damage there.

Allen, who had farmed plaintiff's field in 1948, accompanied Brown on that trip to plaintiff's field. Allen saw only the stalks and said, "They looked like average stalks and I saw no evidence of damage."

*Defendants'* witness Bebout represented the company which financed plaintiff that year and had "taken security on his crop and machinery." Around July 10, Bebout went to plaintiff's field and found the "symptoms" in plaintiff's crop.

We believe that the clear weight of the evidence is that plaintiff's crop was affected *to some extent* by the spray. If we reject entirely the testimony of both plaintiff and defendant· Dick Burke, we have the affirmative testimony of Scott, Jones, Frank Crawford, Simmons, Holmes and Bebout that plaintiff's crop showed the "symptoms." Neither of the other two witnesses who testified on that matter were in plaintiff's field until after the cotton had been picked. Allen (a nonexpert) said the stalks were normal. County Agent Brown said the stalks showed no sign of *serious* 2,4-D poisoning and he found no evidence of any such poisoning, but he would not positively say that "there wasn't some 2,4-D damage to that crop." Our finding is that the spray caused *some* damage to plaintiff's crop.

Late in July or early in August, plaintiff plowed up his north 30 acres as "too badly damaged." From the south 30 acres he picked 6 bales. Plaintiff argues that inasmuch as "on adjoining lands suffering from 2,4-D poison, *properly tended* (our italics), a 50% crop was made or ½ bale per acre," his loss was ½ bale per acre, less the 6 bales picked and sold. (We assume without deciding that this would be true if plaintiff had had as good a crop as his neighbors had and that he had "properly tended" his crop after he discovered it had been damaged.) However, we believe that the record clearly shows that: At time of the spraying, as a result of improper planting and subsequent cultivation, plaintiff did not have as good a crop as any of his neighbors; and, after the spraying, plaintiff did not cultivate his crop as he should have and as did all his neighbors who, by proper cultivation, realized ½ bale per acre from their cotton damaged by the spray, some of which was more damaged than plaintiff's.

There was conflict in the evidence as to the condition of plaintiff's crop immediately prior to the spraying. However, we believe that the evidence strongly supports the statement of defendant Dick Burke that plaintiff's crop "was outstandingly the sorriest on the road." Most of the witnesses described the crop in generalities such as "pretty good," "pretty good chance for a crop," "pretty fair crop," "as good as could be expected." Plaintiff himself went only so far as to say it was "a pretty fair stand." Simmons said it was "about the same as mine" and Scott said it was "not a great deal different from mine." Persuasive, [294] however, is the testimony of defendants' witness Bebout who examined plaintiff's field a few days after the "symptoms" appeared. Note his testimony: On the south side the cotton was bigger; part of the crop had not been "worked out; * * * quite a lot of Johnson

grass hadn't been worked on the west end. * * * The cotton had been chopped out and plowed before. Yet there was quite a lot of Johnson grass. * * * I think there was some all over the field. It was worse in some places than others. * * * The cotton he plowed up wasn't a very good stand, * * * say from one-half to three-fourths. It wasn't as good as that on the south side but it was fair." Other witnesses testified as to the prevalence of Johnson grass in plaintiff's crop.

Thereafter, according to Bebout, the south 20 acres "was pretty well cultivated and worked better" than the north 10. We need not summarize the other testimony on that matter as (by implication in his brief and expressly in his oral argument here) plaintiff's counsel admitted that "plaintiff did not take care of his crop, after it was poisoned, as well as he could have."

■ The measure of damages for injury to or partial destruction of a growing crop is the difference between the crop's value immediately before and its value immediately after the injury; and that value is determined by "the maturity value of the probable crop but for destruction or injury, and by a deduction therefrom of the value of the labor and the expense which, subsequent to its injury or destruction and but for it, would have been required to mature, care for, and market the crop." Happy v. Kenton, 362 Mo. 1156, 247 S. W. 2d 698, 704-705.

■ However, plaintiff did not minimize his damages, as he was under a duty to do. 25 C.J.S., Damages, Sec. 33, p. 499; 15 Am. Jur., Damages, Sec. 27, p. 420. See Hurley v. Illinois Central R. Co., 221 Mo. App. 478, 282 S. W. 97, 99. He cannot recover for damages that he reasonably could have avoided. Lokey v. Rudy-Patrick Seed Co., (Mo. App.) 285 S. W. 1028, 1033; Cline v. City of St. Joseph, (Mo. App.) 245 S. W. 2d 695, 702. Yet, plaintiff "will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss." 15 Am. Jur., Damages, Sec. 23, p. 415. See 25 C.J.S., Damages, Sec. 28, p. 493. This is the Missouri rule. City of Kennett v. Katz Const. Co., 273 Mo. 279, 202 S. W. 558, 562. And see Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 66 S. W. 2d 903, 910.

■ There is sufficient substantial evidence from which we can reasonably and fairly determine plaintiff's loss. Plaintiff's crop was a poor one. Prior to the spraying he had ½ of a crop on the south 30 acres (15 bales) and between ¼ and ⅓ of a crop on the north 30 acres (an estimated 10 bales), and (except for the spraying, and assuming that thereafter he properly cultivated his crop), plaintiff would have realized, not a bale per acre, but only 25 bales on the entire 60 acres. As plaintiff harvested but 6 bales, his loss would first appear to have been 19 bales. Upon the same basis as that of all of the adjoining landowners (who realized ½ bale per

570

acre from their spray-damaged-bale-per-acre crops), plaintiff's loss would have been one-half of 25 bales or 12½ bales. However, the evidence was that after their crops had been damaged, the other landowners properly cultivated the crop and that plaintiff did not. Had plaintiff properly cared for his crop after the spraying, his loss would have been only 12½ bales instead of 19. As plaintiff failed to minimize his damages, he is not entitled to recover for the 6½ bale difference between the 19 bales and the 12½ bales. He can recover for 12½ bales only.

Plaintiff's cotton settlements showed that, for the 6 bales sold, plaintiff received $873.79, less, however, $71.87 for ginning and bagging and $276.76 for picking. Net cash payments to plaintiff totaled $534.16, or an average of $89.04 per bale. Upon such basis, plaintiff is entitled to $89.04 for each of the 12½ bales or $1113.00.

The judgment is reversed and the cause is remanded with directions to enter judgment [295] as of the date of the original judgment (September 11, 1951) for plaintiff against defendants in the sum of $1113.00. *Van Osdol* and *Coil, CC.*, concur.

PER CURIAM:—The foregoing opinion by LOZIER, C., is adopted as the opinion of the court. All the judges concur.