U. S. PARKS, Respondent, Appellant, v. GUY A. THOMPSON, Trustee of the MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant, Respondent, No. 44712—285 S. W. (2d) 687.

Division Two, January 9, 1956.

*H. L. Harvey* and *E. A. Barbour, Jr.*, for appellant Guy A. Thompson.

*Jo B. Gardner* for respondent.

702

[688]   BOHLING, C.—U. S. Parks recovered a judgment against Guy A. Thompson, Trustee of the Missouri Pacific Railroad Company, a corporation, for $20,000 under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The trial was to the court without a jury. § 510.310 (Statutory references are to RSMo 1949 and VAMS unless otherwise indicated.) Each litigant has appealed. Plaintiff's main contention is: ''The amount of plaintiff's recovery should be increased.'' Defendant contends the court erred in admitting certain evidence, and that the judgment is excessive. A prior appeal is reported at 363 Mo. 791, 253 S. W. 2d 796. A companion case is Rogers v. Thompson, 364 Mo. 605, 265 S. W. 2d 282. The parties state the

facts developed at the second trial are substantially the same as stated by the court on the first appeal, with the exception that additional evidence was adduced on the issue of damages. Reference is made to the opinion on the first appeal for a more detailed statement.

Passenger trains are operated at times by defendant in different sections. Plaintiff was injured when defendant's westbound train No. 2d 9, on which he was fireman, ran into the rear Pullman of 1st 9, a short distance west of Syracuse, Missouri, about 7:40 a.m., January 1, 1948, killing a number of passengers, injuring others, and causing property damage. The passengers were on 1st 9 and 2d 9 carried baggage, express and mail. Other crew members on 2d 9 were Conductor Rogers, Engineer Butler, Flagman Journey and a porter.

Defendant's Eastern Division extends from St. Louis to Kansas City. The terminal for freight service was Jefferson City and for passenger service was Sedalia. Plaintiff had made runs in freight service to Jefferson City, but had never made a run west of Jefferson City and was not informed about the track or location of signals west of Jefferson City.

When 2d 9 arrived at Jefferson City about 2:20 a.m., January 1, 1948, 1st 9 had departed. Plaintiff then found out he was going to Sedalia and informed his engineer he did not know about the railroad west of Jefferson City. Second 9 was held at Jefferson City for about an hour and a half for a signalman.

The weather, which had not been good, worsened west of Jefferson City with snow, sleet, wind and ice. This, with the steam and smoke from the engine, affected the visibility ahead.

We state briefly the substance of defendant's operating rules material here. They are more fully set forth at 253 S. W. 2d 1.c. 800, 801.

General Rule B: "Employees must be conversant with and obey the rules and special instructions. *"

Rule 34 required the communication of signal indications between members of engine and train crews.

Rule 108. "In case of doubt or uncertainty the safe course must be taken."

Rule 509 required the stopping of trains at red signals, and obtaining a clearance from the dispatcher before proceeding.

Rule 518 required enginemen, in stormy weather, to approach all signals not plainly [689] seen, at restricted speed. (Plaintiff testified restricted speed meant 15 miles an hour, expecting to stop.)

Rule 955 makes firemen subordinate to enginemen.

Rules 963 and 980 required the keeping of a careful lookout.

Rule 979 made firemen responsible with engineers to prevent rule violations. It required firemen to call the attention of conductors or enginemen immediately to any apparent failure to comply with rules

or instructions; and made them responsible to the extent of their ability to prevent accidents or violations of rules.

Rule 961 made it the duty of the engineer to handle the engine and prevented firemen from operating engines unless authorized to do so. Article 59 of the Union Contract was to like effect, and, we understand, plaintiff did not qualify under § 26(a) of Special Instructions No. 8 for an engineer in passenger service.

At California 2d 9 received the following message from the dispatcher at Jefferson City: "After you meet No. 20 at California and 2d 70, Engine 2209 at Clarksburg, there is no opposing trains in block between Clarksburg and M. K. T. crossing." The M. K. T. crossing is at Sedalia.

Plaintiff testified that after leaving Clarksburg he saw three red signals, which meant stop, and he called them to the engineer, who answered: "The message takes care of that"; that no stop was made or clearance obtained; that all he did was call the signals to the engineer, he did not mention to the engineer he was violating the rules and signals or ask him to stop; that west of Syracuse the track curved to the right, had a slight downgrade; that the steam changed to the other side of the engine and he saw what looked like the road ending in a snowbank and, a little closer, it looked like a train; that he shouted a warning to the engineer; that the engineer applied the emergency brakes; that there were no torpedoes, fusees, flagman or lights; that the speed of 2d 9 had been about 30-35 miles an hour and perhaps increased to 40 miles an hour on the downgrade. Plaintiff was injured in the ensuing wreck.

As a result of the hearing investigating the accident plaintiff was dismissed from service January 14, 1948.

■ There is no merit in plaintiff's point that he was not contributorily negligent. The case was tried below on the theory that defendant was negligent and also that plaintiff was guilty of contributory negligence. In plaintiff's suggested findings of fact and conclusions of law to the trial court, plaintiff, in more than one instance, admitted he was contributorily negligent. The trial court stated, among other things in its findings, that defendant admitted liability and plaintiff admitted some contributory negligence. Such was the trial theory and, although the case is here de novo, the parties are bound by their trial theory. Purvis v. Hardin, 343 Mo. 652, 122 S. W. 2d 936, 939[8]; Duffley v. McCaskey, 345 Mo. 550, 134 S. W. 2d 62, 65[11]; Smithpeter v. Wabash R. Co., 360 Mo. 835, 231 S. W. 2d 135, 146[17], 19 ALR 2d 950. The contention was ruled against plaintiff on the prior appeal (253 S. W. 2d l.c. 801).

■ Defendant makes the point that the court erred in admitting, over objections interposed, evidence of "the amount plaintiff earned as a fireman prior to his discharge, for the reason that such evidence was speculative. Rogers v. Thompson, 265 S. W. 2d 282; Parks v.

Thompson, 253 S. W. 2d 796." Plaintiff testified he earned around $300 a month as a fireman for defendant; and that following his injuries his earnings were about $150 a month. The Rogers opinion has an observation arguendo (265 S. W. 2d l.c. 289[7]) that the reinstatement of a discharged employee rests in conjecture, but the case considered that the prior earnings of a discharged employee had some evidentiary value on the issue of damages for an injury sustained in the occurrence resulting in the employee's discharge. We [690] find nothing in the Parks case in conflict therewith. The presentation does not establish error.

The trial court found plaintiff's damages at $30,000, reduced the amount $10,000 on account of the contributory negligence of plaintiff, and entered judgment for $20,000. Plaintiff says we should increase the judgment to $42,750, with interest on $20,000 from the date of trial. Defendant contends that $20,000 is excessive and should be reduced.

When plaintiff realized a collision would occur he tried to get the curtain of the cab loose but it was frozen. He was climbing over the bar across the top of the coal tender when the wreck occurred and the engine cab came down on his back just below the belt line and mashed and injured him. He was knocked out for a short time and later climbed down from the engine and went to the rear coach of 2d 9.

Plaintiff was hospitalized until January 13, 1948, except while attending the four-day investigation of the accident at Sedalia. He made seven out-patient visits to the Missouri Pacific hospital at St. Louis between January 20th and April 6, 1948. He was again admitted to said hospital July 9th and dismissed July 12, 1948. He was admitted to the Missouri Baptist hospital November 4, 1949, as a patient of Dr. R. D. Woolsey, and dismissed November 7, 1949.

Plaintiff testified he was never completely relieved of pain and has had to go to bed on several occasions; that his sleep is interfered with unless he sleeps with a board under the mattress and when he sits in a straight chair for any length of time, he has to move frequently; that he could do no lifting, or pick up heavy things and carry them, or stoop, bend down to the ground and work, or use his arms, as for instance, in painting; that he takes pills to relieve the pain when he has these "spells." He stated he would be 58 September 5, 1954; and was 52 at the time of the accident. We note that plaintiff's exhibits 1 and 1-A, the Missouri Pacific hospital records concerning plaintiff's admittances on January 3 and July 9, 1948, respectively, give his date of birth as September 5, 1892, and plaintiff's exhibit 8, the Missouri Baptist hospital record of November, 1949, mentions his age as 57. Plaintiff claimed a life expectancy on the basis of age 57—16.43 years. See 42 VAMS 802. Plaintiff was earning $300

monthly at the time of his injury and has been operating a taxicab for some time, earning around $150 a month.

· Two depositions of Dr. R. D. Woolsey, a neurosurgeon, are in the record. The first, dated June 16, 1951, is mentioned in the former opinion (253 S. W. 2d l.c. 799). The second deposition is dated August 18, 1953. He was called to plaintiff's home in November, 1949. Plaintiff complained of pain upon pressure in the lumbosacral area, had right leg limitation of straight leg raising, and limitation of forward bending at about 20-30 degrees of normal. He sent plaintiff to the Missouri Baptist hospital. The x-rays showed the usual amount of osteoarthritis of the lumbar spine for a man of plaintiff's age. (All the doctors agreed the x-rays were not of a type to show a ruptured disc.) His diagnosis was "a ruptured intervertebral disc" at the 4th or 5th interspace in the lumbar area, just below the belt line. The hospital record shows plaintiff entered November 4, 1949, and was dismissed November 7, 1949, with the comment "has improved remarkedly." Dr. Woolsey directed plaintiff to sleep on a mattress with a board under it and to wear a lumbosacral belt. Plaintiff has seen him three times since. Plaintiff saw him twice within a month or two after leaving the hospital, stating "he was much better." Plaintiff was much improved and he advised plaintiff it was all right to go to work. He saw plaintiff again May 6, 1953, and plaintiff stated that at times he had considerable pain, pain in his back and down the back of his right leg, but he was able to drive a taxicab. He advised plaintiff to continue working. He did not recommend and does not now recommend surgery. In his opinion plaintiff at times was better and without pain, but ordinarily had a good deal of pain from day to day; that operating a taxicab was not very good for plaintiff; that plaintiff's [691] back pain was the result of the trauma of January 1, 1948, and was not caused by plaintiff's osteoarthritis. He considered plaintiff's condition permanent, a 20-25% partial permanent disability, and continued to recommend a hard bed and a lumbosacral belt, especially when working. Plaintiff's ability to earn has been decreased. He did not do a myelogram to localize plaintiff's trouble because plaintiff was improving and an operation was not necessary. His experience has been that better results are obtained to wait and 70 to 80% are cured that way. There is a good chance plaintiff's condition will improve without an operation. He stated 60% of those he operated on were working at their former positions and about 90% were working. The charge for an operation would be $500 and for the hospital (10 days) $300.

Dr. F. G. Pernoud, a surgeon of St. Louis, examined plaintiff June 14, 1951, and gave his deposition on June 15, 1951. His deposition is corroborative of the depositions given by Dr. Woolsey. See 253 S. W. 2d l.c. 799. He also stated plaintiff's lumbar spine appeared completely flat and his large loin muscles were tense.

Dr. George L. Hawkins, Jr., a neurosurgeon on the staff of the Missouri Pacific hospital and defendant's witness, examined plaintiff May 5, 1953. Plaintiff was walking and cooperative. Plaintiff complained of low back pain, pain in his right leg, from thigh to knee, and stated he had difficulty in lifting. He had limited lateral bending in his lumbar spine. These may be symptoms of a herniated disc. Plaintiff's complaints were subjective, and he failed to find physical conditions compatible with plaintiff's complaints. Plaintiff had a marked hyper-trophic or degenerative arthritis of the spine, which could not have been the result of the accident (and Dr. Pernoud testified to like effect). Plaintiff's spine had the normal curvature. Straight leg raising could be performed to 75 degrees, which was normal for one of plaintiff's age. Plaintiff had no loss of muscular strength in his lower extremities. He found no evidence of a fractured disc, and attributed plaintiff's pain to the arthritis of his spine. No operation is needed. Trauma could have aggravated plaintiff's arthritic condition and cause him to have pain. It is possible for a gradual deterioration to occur and cause disability a year or so after a trauma. Plaintiff's present condition may continue and it may not. Witness performs laminectomies. Surgery is not a last resort measure, but is employed when the patient does not respond to conservative treatment. Eight weeks should be a sufficient delay in ordinary circumstances. An operation is the most certain way to determine the existence of a ruptured disc. Witness' findings indicated no inter-spinal nerve root compression and a myelogram was unnecessary procedure.

Plaintiff's petition on which the first trial was held was in three counts. Count I asked damages for personal injuries and for loss of wages while plaintiff was disabled from performing his duties for defendant. Counts II and III were based on charges plaintiff had been wrongfully discharged by defendant. Count II was for loss of wages. Said counts were dismissed on motion at the first trial; Count III prior to trial and Count II at the close of all the evidence. We affirmed. 253 S. W. 2d l.c. 797 and 802. On January 17, 1949, plaintiff wrote C. F. Dougherty, his superintendent, stating he knew he had made a bad mistake and asked to be put back to work with yard rights only. The first trial was in October, 1951, approximately three years after plaintiff's injury. The instant trial was in June, 1954. Plaintiff admitted at the instant trial he testified at the first trial that, except for six months after his injury and a later period of a week while in the hospital, he could have performed his work for defendant all right. At the instant trial he testified that since the first trial he had changed his mind about being able to perform his former duties, and that he could not then or now do so. Plaintiff's testimony at the first trial was consistent with his pleadings that he could have returned to work and earned the wages for which he

sought a recovery in Count II. [692] See 253 S. W. 2d l.c. 800. Defendant argues plaintiff should be bound by his pleading (Count I was not amended in the respects mentioned) and his testimony at the first trial, and not be allowed to blow hot and cold.

Howard Mohrlock, of the Allen Commercial Service, St. Louis, engaged in civil investigations, testified that he observed plaintiff's activities on four or five days in 1952 and took motion pictures of plaintiff at intervals during that time; that he saw plaintiff operating a taxicab, getting in and out, going up and down stairs, polishing the taxi, carrying luggage for passengers, running, walking, stooping and bending; and that plaintiff's actions indicated no apparent disability or injury. The motion pictures, taken while plaintiff was working and without his knowledge, confirm the testimony of this witness and refute that of plaintiff in a number of instances, such as on plaintiff's ability to lift and carry things, to stoop, to bend down and to use his arms. Plaintiff in rebuttal testified that he refused to carry heavy articles for his passengers.

Our review of cases tried to the court without a jury, including negligence cases, falls within § 510.310, which provides, so far as material, that: "At or after the trial, the court shall render such judgment as it thinks right upon the law and the evidence." ¶ 2. And: "The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." ¶ 4. Faire v. Burke, 363 Mo. 562, 252 S. W. 2d 289, 290[1], quotes and applies the following from Redden v. Boehmer, Mo. App., 223 S. W. 2d 127[1]: " 'The question for our determination is therefore not merely one of whether the court's finding was supported by substantial evidence. On the contrary, it is our duty to make our own independent finding of the facts and reach our own conclusion as to where the weight of the evidence lies. Whatever findings the lower court may have made are in no sense binding upon us, although in matters where the evidence is conflicting and close we shall have due regard for the lower court's opportunity to judge the credibility of the witnesses.' " Cross v. Gimlin, Mo., 256 S. W. 2d 812[2, 3]; House v. Santa Fe Trail Transp. Co., Mo., 217 S. W. 2d 382-[1]; Dye v. School Dist. No. 32, 355 Mo. 231, 195 S. W. 2d 874, 878-[4,16]; Lowtrip v. Green, 363 Mo. 619, 252 S. W. 2d 524, 527-[6]. This is the established procedure in reviewing suits in equity. Lynn v. Coates, Mo., 142 S. W. 2d 1014, 1019[1]; Juengel v. City of Glendale, Mo., 161 S.W. 2d 408, 410[6]; Lastofka v. Lastofka, 339 Mo. 770, 99 S. W. 2d 46, 54[1, 2]. We affirm the judgment below, or enter or direct such judgment as justice requires. Cases supra. In appropriate instances equity, retaining jurisdiction to do full justice, may award damages. Woolum v. Tarpley, Mo., 196 S. W. 1127, 1128[3]; Hadley

Bros.-Uhl Co. v. Scott, Mo. App., 93 S. W. 2d 276; 280[3]; Maytag Co. v. Meadows Mfg. Co., CCA 7th, 45 F. 2d 299, 301[1], certiorari denied 283 U. S. 843, 51 S. Ct. 489, 75 L. Ed. 1452. In the last mentioned case, a suit to enjoin unfair competition et cetera, with a prayer by defendant for similar relief and damages, a court of equity awarded $500,000 damages where the case was tried without objection or demand for a jury, which judgment was reduced by the court of appeals and judgment directed to be entered for $250,000 (l.c. 303).

The Seventh Amendment to the Constitution of the United States provides: "In suits at common law, where the value in controversy shall exceed Twenty Dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rules of the common law." Consult Missouri constitutional provision Art. 1, § 22(a). The right is a privilege for the benefit of the parties and may be waived by them. Henderson's Distilled Spirits, 81 U. S. (14 Wall.) 44, 53, 20 L. Ed. 815; Maytag Co. v. Meadows Mfg. Co., supra, 45 F. 2d l.c. 301[2-4]; F. Carrera & Hermano [693] v. Font, Gamundi & Co., 70 F. 2d 999, 1001[3]. Trial by jury at common law when the Constitution was adopted was trial by a jury composed of twelve men (Thompson v. Utah, 170 U. S. 343, 350, 18 S. Ct. 620, 42 L. Ed. 1061), and the unanimity of the twelve jurors was essential to a verdict (American Pub. Co. v. Fisher, 166 U. S. 464, 17 S. Ct. 618, 41 L. Ed. 1079).

In Minneapolis & St. L. R. Co. v. Bombolis, 241 U. S. 211, 217, 218, 36 S. Ct. 595, 60 L. Ed. 961, LRA 1917A 86, Ann. Cas. 1916E 505, the court held state courts may give effect to a local practice permitting of less than a unanimous verdict in actions under the Federal Employers' Liability Act, stating, among other things: "Two propositions as to the operation and effect of the Seventh Amendment are as conclusively determined as is that concerning the nature and character of the jury required by that Amendment where applicable. (a). That the first Ten Amendments, including of course the Seventh, are not concerned with state action, and deal only with Federal action. [Citing cases.] And, as a necessary corollary, (b) that the Seventh Amendment applies only to proceedings in courts of the United States and does not in any manner whatever govern or regulate trials by jury in state courts or the standards which must be applied concerning the same. [Citing cases.] So completely and conclusively have both of these principles been settled, * * that it is true to say that to concede that they are open to contention would be to grant that nothing whatever had been settled as to the power of state and Federal governments or the authority of state and Federal courts and their mode of procedure from the beginning. * * And, it was, of course, presumably an appreciation of the principles so thoroughly

settled which caused Congress in the enactment of the Employers' Liability Act to clearly contemplate the existence of a concurrent power and duty of both Federal and state courts to administer the rights conferred by the statute in accordance with the modes of procedure prevailing in such courts." Other cases are to like effect, see annotation, 96 L. Ed. 415, § 8.

The Court in Dice v. Akron, C. & Y. R. Co., 342 U. S. 359, 72 S. Ct. 312, 96 L. Ed. 398, by a five to four vote, ruled in a jury tried case that Ohio law providing for the determination of factual issues by the court rather than by the jury as to fraud in the execution of a release was not applicable to actions under the Federal Employers' Liability Act. The ruling in the Bombolis case was not overruled. The majority opinion undertook to distinguish it and the minority opinion considered it applicable to the stated issue in the Dice case. 342 U.S. at 363 and 365 et seq.

In Union P. R. Co. v. Hadley, 246 U. S. 330, 334, 38 S. Ct. 318, 62 L. Ed. 751, an action under the Federal Employers' Liability Act, the jury returned a verdict for $25,000, which was reduced by the trial court to $15,000, and to $13,500 by the Supreme Court of Nebraska. The United States Supreme Court said: "The court had the right to require a remittitur if it thought, as naturally it did, that the verdict was too high." See Joice v. Missouri-K.-T. R. Co., 354 Mo. 439, 189 S. W. 2d 568, 576, 161 ALR 383; Counts v. Thompson, 359 Mo. 485, 222 S. W. 2d 487, 495; Sanders v. Illinois C. R. Co., 364 Mo. 1010, 270 S. W. 2d 731, 737, and observations re remittiturs in Dimick v. Schiedt, 293 U. S. 474, 55 S. Ct. 296, 79 L. Ed. 603, 95 ALR 1150.

The procedure adopted by plaintiff and defendant in the trial of the instant case does not call for the direction and acceptance of a remittitur or an additur as a condition for not remanding a case for new trial. The instant issue differs. Where parties waive a jury and try their case under § 510.310, the review, as stated above, is "upon both the law and the evidence as in suits of an equitable nature." In his brief filed here plaintiff points out that defendant has waived his constitutional right to a trial by jury; that this court "tries the matter of damages de novo"; [694] and prays for an increased judgment against defendant. Defendant contends the judgment should be reduced. Plaintiff and defendant voluntarily exercised a privilege accorded litigants by Missouri law and chose to try the case without a jury under § 510.310. Neither has been nor is being deprived of any right whatsoever.

As trier of the facts we are concerned with the ultimate fact for determination, the damages to be awarded plaintiff, and findings on the evidentiary facts considered in arriving at the ultimate conclusion need not necessarily be specifically stated. Our review is as in suits in equity and in accord with the Federal law on the issue of

damages. Plaintiff's testimony with respect to the extent of his injuries contradicts his testimony at the first trial. The medical testimony on the issue is contradictory. We are as able as a trial court to pass on the credibility of witnesses testifying by deposition. The record includes testimony bearing on plaintiff's activities several years after his injury, substantiated by motion pictures. Plaintiff is able to work at a gainful occupation. Plaintiff's damages are subject to diminution by reason of his contributory negligence. 45 U.S.C.A. § 53. We have no hesitancy under the instant record in holding we should not enter a new judgment increasing the amount of plaintiff's damages. Our conclusion on the amount of damages, after studying plaintiff's and defendant's evidence on the issue, is that a judgment of $15,000 is just and proper.

Accordingly, the cause is remanded with directions to enter judgment for plaintiff in the amount of $15,000, with interest from date of judgment in the trial court. *Barrett, C.,* dissents; *Stockard, C.,* concurs.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.