Harve MOORE, Plaintiff-Respondent,

v.

ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, a corporation, Defendant-Appellant.

No. 7511.

Springfield Court of Appeals.

Missouri.

Feb. 6, 1957.

Jones & Jones, Kennett, Blanton & Blanton, Sikeston, for appellant.

McHaney & McHaney, Hal H. McHaney, Flake L. McHaney, William H. Billings, Kennett, for respondent.

McDOWELL, Presiding Judge.

This appeal is from a verdict and judgment of the Circuit Court of Dunklin County, Missouri, in favor of plaintiff and against defendant, St. Louis Southwestern Railway Company, a corporation, in the sum of $1,216.50 damages to cotton crop caused by negligence of defendant spraying its right-of-way with "Herbicidal Oil No. 6".

The petition alleged: "* * * that on the 18th and 19th days of August, 1954, * * *

"* * * the defendant acting by and through its agents, servants and employees did spray the weeds and vegetation along and upon its railroad right of way in the vicinity of the lands of the plaintiff with a weed poisoner and did cause said weed poison to wrongfully invade the said premises of the plaintiff and damage and destroy a large part of his said cotton crop; that said defendant did negligently permit and cause said weed poison to spread over the crop of plaintiff as aforesaid by so spraying its right of way when the wind was so blowing as to cause said poison to float onto plaintiff's crop of cotton and did greatly damage and destroy his said crop of cotton."

Defendant's answer was a general denial.

It is plaintiff's theory that the damage to his cotton crop was the result of defendant's negligence in spraying its right-of-way with weed poisoning during a high wind, which carried the spray and material into and over plaintiff's cotton crop. The defense was, that whatever damage, if any, plaintiff suffered to his cotton crop, was due to weather conditions and growing season of 1954, and, not to damage caused by defendant in spraying its right-of-way.

In our opinion we will refer to appellant as defendant and respondent as plaintiff, positions occupied in lower court.

Defendant first assigns as error the action of the trial court in overruling its motion for directed verdict at the close of plaintiff's case and at the close of all the testimony. It contends that the evidence discloses uncertainty as to the cause of damage, if any, to plaintiff's cotton and that there is no substantial evidence to show any alleged damage to plaintiff's cotton was due to spraying; or, how much damage, if any, with any reasonable degree of certainty, was due to the spraying by defendant.

Where a cause is tried by jury this court is bound by the jury's findings of facts, if there is substantial evidence to support the verdict. Pettit v. United Benefit Life Insurance Co., Mo.App., 277

S.W.2d 857, 862; Machens v. Machens, Mo.Sup., 263 S.W.2d 724, 734; White v. Barkovitz, Mo.App., 254 S.W.2d 291, 294.

Only where there is a complete absence of probative facts to support the conclusion reached does reversible error appear. But where there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. Winters v. Terminal R. Ass'n of St. Louis, 363 Mo. 606, 252 S.W.2d 380, 384; West v. St. Louis-San Francisco Railway Co., Mo.Sup., 295 S.W.2d 48.

The last cited case states the law that where the defendant assigns as error the court's refusal to direct a verdict for defendant, Supreme Court in considering assignment would state the evidence favorable to plaintiff and disregard defendant's evidence, unless it added to plaintiff's case. Williamson v. St. Louis Public Service Co., 363 Mo. 508, 252 S.W.2d 295.

■ The law is that defendant, railroad company, had the legal right to use beneficial sprays to eliminate weeds on its right-of-way, if used in a reasonable manner, but such preventative measures cannot be used with absolute impunity; due care must be exercised to prevent the spray from drifting on and damaging crops of others. In other words, defendant owed a duty to plaintiff, while spraying its right-of-way, to avoid using such spray at a time when the wind was blowing to an extent that it would carry the spray over plaintiff's cotton crop in such quantities as to injure the same. Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289.

The evidence, stated most favorable to plaintiff, shows that defendant's railroad running from southeast to northwest passes through Hornersville, Dunklin County, Missouri; that plaintiff's 80 acres of land, on which the cotton in question was growing in 1954, lies directly north of defendant's right-of-way, less than one-eighth of a mile; that the farm buildings and grape arbor, mentioned in evidence, are located in the southeast corner of plaintiff's land on a blacktop highway forming the south boundary; that a gravel street extends from near the southeast corner of the 80 acres to and crosses defendant's right-of-way on the east side of the town, about a block east of the depot; that Leachville Junction lies west of the gravel intersection, about three-fourths of a mile. At this junction one main branch of defendant's tracks goes in a southwest direction to Leachville and a main branch goes in a northwest direction to Paragould.

There is no dispute that between the hours of 6:00 and 7:00 o'clock, p. m. on August 18th, defendant sprayed its right-of-way coming from the east up to and stopping at the junction of the gravel road or street with its right-of-way, about a block east of the depot in the east part of town; that the spray used was a "Herbicidal oil No. 6", manufactured by Lion Oil Company. The oil was mixed with water in proportion of one and one-fourth gallons to one gallon of oil, and an emulsifier, and, was applied on the right-of-way through spraying nozzles at the rate of 160 gallons of oil per mile under 60 pounds of pressure. Defendant used a spray car followed by a car of chemicals and a car of water. The nozzles were attached to the booms on the front of the spray car. The booms that cross the center of the track over the crossties are stationary. Those on each side of the track are movable, up or back. The water and chemicals are pumped through a series of hoses by a Ford motor and mixed under pressure and forced through the nozzles located along the booms. The booms in the center of the track are 12 to 14 inches above the rail. The other booms go out straight and if the dump is above the ground elevation the height above the ground would vary with the height of the berm at the toe of the shoulder of the embankment. It is admitted that the track elevation on the east side of the town is 10 or 12 feet higher than the ground level and 2 feet higher at Leachville Junction.

Some 23 witnesses testified for plaintiff. Most of the testimony was uncontradicted. We will state only the substance of this testimony. It shows that when the spray train reached the gravel junction in Hornersville, between 6:00 and 7:00 o'clock p. m., on August 18th, the spray was fogging up on both sides of the track; one witness stated from 10 to 12 feet high. That the spray continued 5 or 10 minutes after the engine stopped at the junction; that at the time of the spraying the wind was blowing from the south toward plaintiff's land; one witness said "pretty strong", and another said "between 20 and 30 miles per hour". Witnesses, Stone and Pierce, who lived on adjoining lots on the gravel street between plaintiff's farm and the right-of-way, some 200 to 250 feet north from where the train stopped spraying, and, some 250 yards from plaintiff's southeast corner, testified that the odor from the spray was so strong they had to go into their homes. Stone said that about 8:00 or 9:00 o'clock of the same evening, he went to plaintiff's home to get some turkeys; that while there he smelled the same odor, but not so strong, as he smelled at home from the spray.

The testimony further shows that between the hours of 7:30 and 8:00 a. m., August 19th, defendant's spray train started spraying at Leachville Junction on its Main line southwest to Leachville; that at that time witness Heathington, a farmer who was disking cotton rows within 10 or 15 feet of the right-of-way, testified that the spray was fogging up as high as the boxcar and that there was a strong wind blowing from the south or southwest toward plaintiff's field. In the afternoon the train backed up from Leachville and sometime between 5:00 and 6:30 o'clock p. m., started spraying its right-of-way on its main line running northwest to Paragould. Some of the witnesses said it was just before sundown and some said it was about 15 minutes before the wind and rainstorm struck the vicinity. We think the evidence is undisputed that the wind was blowing hard on the 19th, some witnesses stated

between 15 and 25 miles per hour, some said 35 miles per hour; admittedly, the wind was blowing harder than it had been through the day at the time of the rainstorm and defendant's evidence is that the train was some 16 miles from Leachville Junction at the time of the storm.

It is undisputed that the right-of-way from the gravel junction on the east side of the town, a distance of some three-fourths of a mile to Leachville Junction was burned off and not sprayed.

Plaintiff's testimony, from many witnesses, was to the effect that they had observed plaintiff's cotton prior to the date of spraying on the 18th and 19th of August and prior to the wind and rainstorm; that the cotton was in good growing condition and green, both bolls and leaves; that these witnesses were called in by plaintiff, many of them, all the way from two days after the spraying until September 8th, and found the leaves and bolls in the top of the stalks were dying; one witness said "crimped up"; that this condition was generally all over the 62 acres of cotton, except just north of the buildings, fences and grape arbor in the southeast corner; that the cotton for about 10 or 12 rows out from these obstructions was not injured, but green. The testimony of most of the witnesses was that the cotton looked like a bad job of defoliation; that they had never observed cotton which was affected like this. They gave it as their opinion that it was not caused from dry weather or rain, but stated it was from some substance that had floated in from the south. They testified as to the leaves dying and bolls drying up in the top of the stalks; that some leaves were partly killed and partly green; that there were burned spots.

Photographs, taken on September 8th, of plaintiff's cotton were offered in evidence and from them witnesses pointed out the dead leaves and bolls and testified that the injured cotton was worse on the south side; that this condition was general all over the field.

It is admitted that plaintiff planted 62 acres of cotton, which extends from the south boundary back north on the 80 acres; that on May 1st a frost caused 52 acres of the cotton to be replanted, which was done between the 10th and 12th of May. It is also admitted that there are now pending 13 lawsuits by farmers living in the vicinity of Hornersville, along and near defendant's right-of-way where spraying was done, and many of them are witnesses. They testified that some two days after the spraying their cotton began to wilt and die and looked like it had been defoliated; that the cotton was green and in good condition prior to the spraying; that they examined plaintiff's cotton and it was dying just like their own; that the injury to the stalks was worse on the south side and the cotton which was not near the right-of-way was not injured.

Heathington testified that he gathered some leaves, stems and bolls from his injured cotton and some bull nettles which had been sprayed on the right-of-way; that he sent some of these samples to Dr. A. C. Magill, Chemist, at Cape Girardeau.

Dr. Magill, a Professor of Chemistry, testified that he visited Hornersville, at the instance of plaintiff, on October 8th, and examined plaintiff's cotton and that of others; that he got samples of the leaves, stems and bolls from plaintiff's cotton and from the fields of Heathington and George Jaco; that he received a sample of bull nettles through the mail. He stated he made a chemical examination of these plant materials and of the sample of herbicidal oil used by defendant. He testified that he found traces of oil on the leaves and stems taken from plaintiff's cotton and the other cotton and, as nearly as he could determine, the oil he found was the same as the herbicidal oil No. 6. He stated his opinion was based on test for gravity. He stated plaintiff's cotton looked like it had been defoliated; that the leaves turned brown and had dried up; that this condition existed over plaintiff's cotton except for approximately 40

feet immediately back of the barn, grape arbor and small buildings; that he noticed a sycamore tree near defendant's right-of-way in Hornersville, near where the spray train had stopped on the 18th, and the leaves on the south side were dead and on the north side, green.

J. H. Scott, Dunklin County Agricultural Agent, testified he examined plaintiff's cotton and that, in his opinion, the condition was caused by some foreign substance brought through the air and deposited on the cotton.

Norman Brown, member of the Faculty of the Agricultural Department of the University of Missouri, testified that in his opinion the damage to plaintiff's cotton was caused by a material, unknown to him, brought in by wind from the general direction of the south.

William J. Murphy, Field Crop Specialist from the University of Missouri, testified:

"Q. What in your opinion caused the damage which you observed in the field on that occasion, Mr. Murphy? A. Well, in my opinion the damage caused in the field, there is a high degree of probability it was caused by some material that landed on the cotton plants."

He testified there was not quite as much damage on the north side of the plants as on the south.

As to damages, plaintiff testified that he was acquainted with the fair and reasonable market value of his cotton on August 18th, prior to the spraying, and, that in his opinion, his cotton crop on that day, based solely upon its then condition was of the value of $13,764; that he knew the fair and reasonable market value of this crop after the spraying occurred on August 18th and, in his opinion, its value was $11,331.68. He stated no additional work was needed to complete the crop. He gave this testimony:

"Q. Now, then, how do you estimate your cotton values on a certain

day, tell the jury how you estimate that? A. Well, you would have to estimate it from your average of what you have been doing, wouldn't you?

"Q. You are answering the question, is that what you say? A. Well, you have to figure what you would have made and what you did make.

"Q. Based on other years? A. I know what I did make.

"Q. In other years, is that right? A. You would have to base it on something.

"Q. All right. Did you have on your second planting a good stand of cotton? A. Yes, sir.

"Q. I will ask you, as a farmer, if one of the ways that a farmer estimates his cotton, assuming that he has a good stand, is to count the bolls on his cotton stalks, the bolls that would be reasonably sure in your judgment to mature, isn't that one way that you estimate the crop that you are estimating, rather than what you have done in some other years? A. You could estimate it that way, but it would be a quicker way to just look at it."

The witness stated that he could tell good cotton from bad and that he thought by looking at the cotton he could get pretty close to its value. When asked how he reached the values he put on his cotton crop, he gave this answer: "All right, sir. I figured before at 600 pounds to the acre at 36 cents, which was $13,764.00. After I made 449 pounds of lint per acre at 36 cents, and $5.00 a bale for rebate on the seed, which would be $166.64 times 62 acres would be $11,331.68."

For decision of this alleged error, we think it is unnecessary to set out all of the testimony touching the damaged cotton. Dr. Magill did testify that the oil, such as used by defendant in its spray, killed the cotton by suffocation and not by poison. He testified that the sample of oil, furnished by defendant, if applied to a living plant, would kill it. He stated a plant breathes in carbon dioxide just as animals breathe in oxygen, and that they breathe it through the leaves, not through the soil; that if anything is done to coat over the opening of the pores so carbon dioxide can't get into the leaves, it will suffocate them. This testimony was corroborated by Specialists offered by defendant.

It is contended by defendant that the evidence discloses uncertainty as to the cause of damage, if any, to plaintiff's cotton and that there is no substantial evidence to show any alleged damage caused by the spraying.

With this contention we cannot agree. There is substantial evidence offered by plaintiff that the oil spray used, will injure or destroy the cotton plant or leaf if it comes in contact with them. Dr. Magill testified as to the carrying capacity of the wind and that such particles of oil will and can be carried by the wind. There was substantial evidence that at the time of the spraying there was a strong wind blowing in the direction of plaintiff's land; that the odor from the spray was detected on the southeast corner of plaintiff's cotton field and that when the cotton was observed some two days later it had begun to wither and dry up and became worse as time passed. A chemical analysis of the cotton leaves and stems disclosed oil similar to the oil used by defendant in its spray. It was the opinion of expert witnesses that the injury was caused by oil. The evidence discloses the cotton was injured on the south side more than on the north and that only cotton in the vicinity of the railroad was injured and the cotton protected by buildings and grape arbor was not injured. Plaintiff's evidence conclusively shows that his cotton crop in 1954 was injured by the hot, dry season and the rain and windstorm occurring on August 19th; that the cotton production was decreased. Witness after witness testified they had observed cotton bolls injured by dry weather and rain but they had never seen the kind of injury they had observed in plaintiff's

cotton crop. From all of the testimony we find there was substantial evidence to support the findings of the jury that plaintiff's cotton was damaged as a result of the spraying of defendant's right-of-way.

In Gaines v. Property Servicing Company, Mo.Sup., 276 S.W.2d 169, 173, this law is stated:

" * * * The general rule is 'that if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable, although his negligence was not the sole negligence or the sole proximate cause, and although his negligence, without such other independent, intervening cause, would not have produced the injury.' Harrison v. Kansas City Electric Light Co., 195 Mo. 606, 93 S.W. 951, 956, 7 L.R.A.,N.S., 293; Gray v. Kurn, 345 Mo. 1027, 137 S.W.2d 558, 566(9); 38 Am.Jur. 729, Negligence, Sec. 71.

"The rule further is that ' * * * if the initial act or omission is one from which harm is the natural, probable and foreseeable consequence then he who performs the original act or makes the original omission is liable, notwithstanding the fact that other causes, conditions or agencies intervene between his negligence and the ultimate result.' * * * " (See cases cited.)

In Caldwell v. St. Louis Public Service Company, Mo.Sup., 275 S.W.2d 288, 293, this law is stated:

" * * * It is not the law that defendant Beck's negligence must have been the sole proximate cause of plaintiff's injury in order for that defendant to be liable therefor. A defendant is liable for an injury, if he is guilty of negligence which is a contributing or concurring cause, but not the sole cause, if it combines with other causes (than contributory negligence of plaintiff) to produce it. 'Otherwise stated, a defendant is liable if his negligence is

a proximate cause of an injury even though it is not the sole proximate cause thereof.' * * * (See cases cited.) Boyd v. Terminal Railroad Ass'n of St. Louis, Mo.Sup., 289 S.W. 2d 33.

The burden of proof is upon plaintiff to prove the negligence charged. It is not enough to show an accident and an injury. The mere concurrence of negligence and injury does not make defendant liable. There must be a direct connection between the negligent act and the injury, and the negligence must be the proximate cause of the injury. Warner v. St. Louis & M. R. R. Co., 178 Mo. 125, 77 S.W. 67, 69; Williams v. Thompson, Mo.App., 166 S.W.2d 785, 786; 25 C.J.S. Damages § 27, p. 493.

The damages shown must be reasonably certain to result from the injury. Waddell v. Metropolitan St. Ry. Co., 113 Mo.App. 680, 88 S.W. 765, 767.

Speculative, contingent or merely probable results are not a proper element of damages.

In Reynolds v. Metropolitan St. Ry. Co., 136 Mo.App. 282, 116 S.W. 1135, 1138, the law is stated:

" * * * 'If the injury may have resulted from one of two causes for one of which and not the other defendant is liable, the plaintiff must show with reasonable certainty that the cause for which the defendant is liable produced the result, and, if the evidence leaves it to conjecture, the plaintiff must fail in his action.' Young v. [Missouri Pac.] Railway Co., 113 Mo.App. 636, 88 S.W. 767, and cases cited. 'When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to be established by legitimate proof.' * * If he has adduced facts and circumstances from which a reasonable inference arises that one or more of the specified acts of negligence on the part

of defendant was the direct cause of his injury, he has discharged his burden and was entitled to go to the jury. * * *"

In 25 C.J.S. Damages § 28, p. 493, the law is stated:

▆ "The rule against the recovery of uncertain damages generally has been directed against uncertainty as to cause rather than uncertainty as to measure or extent. In other words, the rule against uncertain or contingent damages applies only to such damages as are not the certain results of the wrong, and to such as are the certain results but uncertain in amount.

"In many cases, although substantial damages are established, their amount is, in so far as susceptible of pecuniary admeasurement, either entirely uncertain or extremely difficult of ascertainment; in such cases plaintiff is not denied all right of recovery, and the amount is fixed by the court or by the jury in the exercise of a sound discretion under proper instructions from the court."

▆ There was substantial evidence in the instant case to support the jury's finding that plaintiff's cotton was damaged and that the direct and proximate cause of the damage was the negligence of the defendant in spraying its right-of-way when the wind was strong enough to drift the spray into plaintiff's field and, under the authorities herein set out, we find there is no merit under this allegation of error that the evidence discloses uncertainty as to the cause of damage to plaintiff's cotton and that there is no substantial evidence that the alleged damage was not due to the spraying.

The last part of this alleged error is, that there wasn't substantial evidence to show how much damage, if any, with any reasonable degree of certainty that was caused by the defendant's spraying.

▆ In Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289, 294, this law is stated as to the measure of damages to growing crops:

"The measure of damages for injury to or partial destruction of a growing crop is the difference between the crop's value immediately before and its value immediately after the injury; and that value is determined by 'the maturity value of the probable crop but for destruction or injury, and by a deduction therefrom of the value of the labor and the expense which, subsequent to its injury or destruction and but for it, would have been required to mature, care for, and market the crop.' Happy v. Kenton, 362 Mo. 1156, 247 S.W.2d 698, 704–705.

" * * * Yet, plaintiff 'will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.' 15 Am.Jur., Damages, Sec. 23, p. 415. See 25 C.J.S. Damages § 28, p. 493. This is the Missouri rule. City of Kennett v. Katz Const. Co., 273 Mo. 279, 202 S.W. 558, 562. And see Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 66 S.W. 2d 903, 910."

▆ Following the law as declared in 25 C.J.S. Damages § 28, p. 493 that the rule against recovery of uncertain damages generally has been directed against uncertainty as to cause rather than uncertainty as to measure and extent, we find against defendant on this contention. However, we are not saying that the evidence is sufficient to comply with the law proving damages to unmatured crops. We think the law, as set out in this opinion, that where substantial damages are established but the amount, so far as susceptible to pecuniary admeasurement, is either entirely uncertain or extremely difficult of ascertaining, will not prevent recovery. The amount will be fixed by the jury under proper instruction from the court.

404

Under allegation of error numbered II, defendant contends that the trial court erred in giving instruction No. 3, first, because the crop alleged to have been damaged was unmatured; that it has no reasonable market value; that the correct measure of damages is the probable yield of the unmatured crop, together with the price for which plaintiff could have sold said crop, less the cost of maturing, harvesting and marketing it; that plaintiff offered no substantial evidence as to the probable yield of the cotton nor of the cost and expense thereafter to harvest and market it.

■■■ We agree with defendant that there was no substantial evidence offered showing the probable yield of the cotton in the year 1954, nor what the cotton crop would have sold for. We, likewise, think that the evidence offered was not the best evidence that plaintiff could have produced to show such facts. The record is entirely silent as to the market value of cotton in 1954. We further point out regarding the evidence that it is common knowledge that hand-picked cotton is more valuable than machine-picked cotton or snapped cotton. There was no evidence at all from which the jury could have reasonably determined the market value of this cotton without guessing or speculating. Likewise, there was no evidence to establish what this land would reasonably have produced under the seasonal conditions of the year 1954. Admittedly, there was a drought accompanied by hot winds, together with a rain and windstorm, which, plaintiff's testimony discloses, to some extent injured this cotton crop. There was no testimony offered to show what similar lands, under like conditions in this vicinity, would have produced, but, plaintiff, himself, merely guesses without offering any basis for his estimate that the 62 acres of cotton would have produced 600 pounds of lint cotton per acre. He stated he made this estimate by looking at it. We think the best evidence to show this would have been to show what other farmers in the community, where there was no injury from spraying, as here, produced on similar land under like circumstances, in 1954.

The rule as to damages to unmatured crops caused by poisonous spray has been declared by the Supreme Court of this state. In Faire v. Burke, supra, it will be noted in the opinion, 252 S.W.2d on page 294, that the court stated the measure of damages for partial destruction of a growing crop "is the difference between the crop's value immediately before and its value immediately after the injury; and that value is determined by 'the maturity value of the probable crop but for destruction or injury, and by a deduction therefrom of the value of the labor and the expense which, subsequent to its injury or destruction and but for it, would have been required to mature, care for, and market the crop.'"

■■■ In the instant case the plaintiff wholly failed to offer evidence to comply with the rule as thus declared by our Supreme Court.

This opinion also cites Happy v. Kenton, 362 Mo. 1156, 247 S.W.2d 698, 704–705. In this case plaintiff was seeking to recover damages for the loss of a crop caused by overflow from a dam and the court made this statement of law on page 704.

"If you find that on account of the erection of said dam the crops grown on any part of said land which this plaintiff had rented during or in any of the years 1944–1949 inclusive, if any, were damaged, then the measure of damages for the crops thus injured is the difference between the value of the crops which could ordinarily and reasonably been raised on said land in similar seasons if said dam had not been constructed, and the value of the crops actually raised by plaintiff."

It was contended that the above instruction improperly stated the measure of damages, and the court made this statement:

"* * * While in Jones & Jones v. Cooley Lake Club, 122 Mo.App. 113,

116, 117, 98 S.W. 82, 83, the court said that the measure of damages for injury done to a growing crop is 'The difference in value of the crop produced from that which was ordinarily produced on the land in like seasons', nevertheless, we think there can be no question but that the measure of damage for injury to or destruction of a growing annual crop is, in the case of total destruction: the value of the crop at the time and place of destruction; and as to injury or partial destruction: the difference between the value of the crop immediately before and immediately after the injury." (Citing much authority.) And then the court declared the law thus:

"However, to determine the value of a growing annual crop at the time and place of destruction or its value immediately before and immediately after any injury, we have approved a method to ascertain the amount of damages. This, by a consideration of evidence showing the maturity value of the probable crop but for destruction or injury, and by a deduction therefrom of the value of the labor and the expense which, subsequent to its injury or destruction and but for it, would have been required to mature, care for, and market the crop. * * * There may be instances in which the statement of the *method* of ascertaining the damages as the *measure* of damages would be prejudicial to a defendant and thereby make an instruction so doing reversibly erroneous. * * *"

 In the instant case we think that under the evidence offered by plaintiff, instruction No. 3 was made reversibly erroneous for the reason that it permitted the jury to base a verdict upon testimony which was not the best evidence in determining the value of unmatured crops under the rule established by the Supreme Court. Clearly, the jury did not follow the evidence of plaintiff in arriving at its verdict, and, so far as we can ascertain from the

evidence, only one other witness, Heathington, testified that the crop was damaged 200 pounds of cotton to the acre. He does not explain whether he meant 200 pounds of lint cotton or 200 pounds of seed cotton and he stated that he didn't know that the damage was actually caused by the spraying.

Defendant cites much authority from other states, but, since our Supreme Court has passed directly upon the question and declared the method by which damages should be ascertained, we find it unnecessary to go into these cases.

Allegation of error numbered III complains of the court's admitting, over the objection of defendant, incompetent evidence as to the measure of damages.

 We think there is merit as to this contention. The court permitted witness, Heathington, to guess as to damage to plaintiff's crop when he stated he did not know. This invaded the province of the jury and should have been ruled out. We need not pass upon whether or not the owner of the cotton could testify as to the value of his crop, yet, under the rulings of the Supreme Court, this was not the best evidence of the proof of damages.

We think this cause must be retried. Having held that plaintiff made a case and we think that under a proper consideration of the holdings of the court in this opinion the trial court can correct matters of evidence in the retrial.

Allegation of error No. IV., complains of error by limiting the cross-examination, by defendant, of plaintiff's witnesses who had similar undisposed of lawsuits.

 In Kunz v. Munzlinger, Mo.Sup., 242 S.W.2d 536, 538, the law is stated:

"* * * The interest of a witness, party or otherwise, may be shown as affecting his credibility. Sec. 491.010, Mo. RS 1949, Sec. 1887, Mo. RSA. 'The interest of a witness with respect to the issue on trial is never irrelevant'.

Arnold v. Alton R. Co., 348 Mo. 516, 154 S.W.2d 58, 62. 'Considerable latitude is permissible on cross-examination in probing a witness as to his interest or bias, but the extent to which such examination may go rests largely in the discretion of the court.' Holden v. Berberich, 351 Mo. 995, 174 S.W.2d 791, 793, 149 A.L.R. 929."

■ Under 42 V.A.M.S. Supreme Court Rule 1.08 it was the duty of defendant's attorney to point out to this court the testimony of witnesses which was offered by the defendant and refused by the court, but excluded. True, we can read the examination of 40 or 50 witnesses offered at the trial, but, at that, we may be unable to find the testimony most complained of. We have read the record and, in some instances, think the trial court erred in refusing testimony, but we are unwilling to convict the trial court of error under this objection. The court will have a chance to retry and correct any mistakes he might have made.

Cause reversed and remanded for a new trial.

STONE and RUARK, JJ., concur.

On Motion for Rehearing and Transfer.

McDOWELL, Presiding Judge.

Respondent's motion for rehearing or in the alternative to transfer the above cause to the Supreme Court is by this court denied.

The motion complains that this court erred in holding that the proper method of showing damages to immature crops was not followed. Since our opinion has been handed down, the Kansas City Court of Appeals passed directly upon this question in Beaty v. N. W. Electric Power Cooperative, Mo.App., 296 S.W.2d 921.

The court, in its opinion, specifically held that the method of proving damages to immature crops, as stated by us in the instant case, must be followed.

Respondent further contends that the opinion should be modified so as to limit the retrial to the issue of damages only.

To support this contention Hufft v. Kuhn, Mo.Sup., 277 S.W.2d 552, 555, and Section 512.160 RSMo 1949, V.A.M.S. are cited.

■ Following the law as declared by the Supreme Court and as provided in the statute cited, we have examined the record of the trial in the instant case and find that there are so many errors committed in the introduction of testimony and by the rulings of the trial court that the cause was not properly and fairly tried, both as to liability and as to damages, and, for that reason, we ordered a retrial of said cause. The verdict in this case was a nine man jury verdict, showing that the issue of liability was questionable. Among the errors committed by the trial court were that he permitted respondent's witnesses, without proper qualification, to testify as to the cause of the damage, if any, which was an invasion of the province of the jury. He, likewise, unduly restricted cross-examination of respondent's witnesses by appellant to show their interest.

STONE and RUARK, JJ., concur.